No. 84-128

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

---

SHIRLEY CRENSHAW,

        Plaintiff and Respondent,

-vs-

BOZEMAN DEACONESS HOSPITAL, EDWIN E. DAHLBERG,
Administrator and RUSSELL NIELSEN,

        Defendants and Appellants.

---

APPEAL FROM: District Court of the Eighteenth Judicial District
In and for the County of Gallatin,
The Honorable Thomas Olson, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Berg, Coil, Stokes & Tollefsen; Ben E. Berg, Jr.
        argued, Bozeman, Montana

    For Respondent:

        Goetz, Madden & Dunn; James Goetz argued, Bozeman,
        Montana

---

        Submitted: September 27, 1984

        Decided: December 6, 1984

Filed:

---
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

Bozeman Deaconess Hospital appeals from a judgment on a jury verdict entered by the District Court of the Eighteenth Judicial District of the State of Montana, in and for the County of Gallatin, in favor of respondent, Shirley Crenshaw, on her claims for relief from the termination of her employment.

On December 1, 1981, Crenshaw commenced employment with the Hospital as a respiratory therapist. Prior to that time, she had been employed by an independently operated respiratory therapy department which contracted services to the Hospital. The department was purchased by the Hospital on December 1, 1981. Crenshaw worked for the Hospital until January 8, 1982, at which time she took a leave of absence until February 8, 1982. After returning to work, Crenshaw was employed until March 12, 1982, when she was discharged.

Subsequent to the take-over of the respiratory department by the Hospital, two orientation meetings were held with employees of the respiratory therapy department. The employees were given information regarding salaries, benefits and formal orientation. The employees were given a personnel policy manual. A provision in the manual provided: "You are on probation during the first 500 hours of employment. Any employee may be discharged without notice during the probationary period." Both parties concur that Crenshaw had not completed the 500 hours of probationary status at the time of her discharge on March 12, 1982.

The immediate dispute began in the late hours of March 11, 1982. Three nurses on duty in the intensive care unit complained to their supervisor, Terry Knoble. A meeting was

2

held between Terry Knoble, the three nurses, Russell Nielsen, the personnel director, and Bill Kirtley, the acting head of the respiratory therapy department. Following the meeting, a discharge memorandum was prepared directing Crenshaw's discharge. The discharge document charged Crenshaw with:

"Insubordination;

"disrupting the continuity of care;

"continually getting in the way of patient care;

"disorderly conduct;

"unsatisfactory work performance;

"violation of safety and/or health rules; and

"breach of confidentiality."

The testimony reveals, on the night of March 11, 1982, Crenshaw was not at home when the Hospital attempted to reach her at 10:30 p.m. That evening Crenshaw had been visiting a former patient. Crenshaw's husband telephoned her to tell her that the Hospital had called. Crenshaw telephoned the Hospital and was told that she would be needed at the Hospital later that evening. Crenshaw immediately departed to the Hospital. The former patient's daughter, Berna-Dean Hennessey, drove her to the Hospital. Hennessey remained at the Hospital for a number of hours. Related to Hennessey's presence, the discharge document charged Crenshaw with "breach of confidentiality." The Hospital contends a breach of confidential information resulted when Hennessey accompanied Crenshaw to the Hospital lab. While Crenshaw ran a separate errand, Hennessey waited for a blood-gas report and delivered it to the ICU. Crenshaw contends the report was not readily comprehensible to a lay person. Hennessey testified:

3

"(a) she did not examine the contents of the slip, (b) that upon arriving at the intensive care unit she put her hand inside the curtain and handed the slip to someone tending to patient care, and (c) that she did not at any time view the patient."

The "insubordination" charge stemmed from the nurses' allegation that Crenshaw attempted to perform ABG's (arterial blood gases). This fact is disputed not only by Crenshaw, but by the nurses and doctors present. There is question as to whether or not Hospital policy forbid respiratory therapists from doing ABG's.

The discharge document also accused Crenshaw of not performing "the respiratory therapy task of suction as needed." Again there was a dispute as to whether suctioning was called for. The nurses testified that the suctioning should have been performed for the sake of appearance of the patient. However, one of the physicians testified that suctioning was not required "that it could have been a waste of time . . . with the disconnection of the ventilator necessary to suction the patient."

The three nurses present during the shift, also charged that Crenshaw was disrupting the continuity of patient care. As a result, Crenshaw was accused of "endangering patient well-being." The nurses testified that Crenshaw repeatedly answered the telephone, read electrocardiogram monitors and distracted the nurses by commenting on the irregular cardiac display on the monitors. The testimony regarding this allegation is in conflict. Two physicians present during the controversial shift testified that they found nothing deficient about Crenshaw's performance. Also, one of the nurses in attendance during part of the shift, confirmed that there was no misbehavior on Crenshaw's part. Finally, the discharge document states that Crenshaw had been subject to

previous verbal counselings. It was established at the trial, however, that this was false and that Crenshaw had not been subject to previous disciplinary action by the Hospital.

The following morning, Crenshaw was called into the Hospital. Crenshaw was given the disciplinary discharge document and was advised to see the administrator the following Monday. On Monday, March 15, 1981, Crenshaw met with the administrator, Edwin Dahlberg. He informed her that he would review the matter, the administrator conducted interviews of those present in the intensive care unit during the morning in question. The administrator affirmed the discharge in a letter to Shirley Crenshaw, dated March 15, 1981. Crenshaw contends that the administrator failed to interview all of the staff members, even though he was aware that they had been present during the controversial shift and that the charges were strongly contested.

After her discharge, Crenshaw applied for unemployment compensation benefits. Crenshaw alleges the Hospital informed the Bozeman Job Service indicating that she had been discharged for unsatisfactory performance and for endangering patient well-being. As a result, Crenshaw was unable to procure employment in the medical community in Bozeman. She encountered difficulties because of a lack of references from her previous employer. In January, 1983, she and her husband were forced to close his construction business and move to Spokane. After two months of job seeking, she has been employed part-time and full-time at various jobs.

Crenshaw contends the Hospital acted with malice: (1) by lodging and sustaining false charges against her; and (2) by tampering with her personnel file. Crenshaw claims a certificate authorizing her to perform arterial blood gases was removed from the file.

Crenshaw filed the present action on December 10, 1982, alleging that she had been wrongfully discharged from her employment with Bozeman Deaconess Hospital and sought damages under several theories. Crenshaw alleged the Hospital breached the implied covenant of good faith and fair dealing. She further alleged the actions of appellants were negligent and were malicious and/or in wanton and/or in willful disregard of her rights entitling her to exemplary damages. The complaint was amended to include a fourth count alleging a separate tort in violating the duty of good faith owed to her. A jury trial was held on November 28, 1983. The jury found for Crenshaw and awarded her $125,000 in compensatory damages and exemplary damages in the amount of $25,000.

The issues raised on appeal are as follows:

(1) Whether an at-will probationary employee is covered by the implied covenant of good faith and fair dealing.

(2) Whether the record sustains a separate action based on negligence.

(3) Whether the trial court abused its discretion in permitting an expert witness to testify on the question of breach of duty on either wrongful discharge or fair dealing.

(4) Whether the award of punitive damages upon a finding of negligence and/or breach of implied covenant of good faith and fair dealing was proper.

The Hospital submits that the covenant of good faith and fair dealing does not apply to a probationary employee, and that the trial court erred in giving an instruction as such.

The court gave the following instruction over the Hospital's objection:

> "Instruction 14. You are instructed that Bozeman Deaconess Hospital, . . . may classify certain of its employees as

6

probationary employees and these
employees may be discharged if they do
not measure up to the Hospital standards
during the probationary period. However,
even these employees are owed a duty of
good faith and fair dealing and the
Hospital must comply with its written
policies concerning these employees."

The court refused the Hospital's proposed instructions no. 41
and no. 42 which consecutively stated:

"Instruction 41. You are instructed that
plaintiff Shirley Crenshaw was a
probationary employee of defendant
Bozeman Deaconess Hospital and that the
purpose of a probationary status is to
provide a brief period in which to
measure the employee's ability to perform
her job before granting her a degree of
job security. If the employer feels that
the employee is not measuring up during
this probationary period, it can dismiss
that employee without procedural due
process.

"Instruction 42. You are instructed that
if you find from the evidence that
plaintiff Shirley Crenshaw was a
probationary employee of defendant
Bozeman Deaconess Hospital and that the
purpose of a probationary status is to
provide a brief period in which to
measure the employee's ability to perform
her job before granting her a degree of
job security, then you are instructed
that if the employer feels that the
employee has not measured up during the
probationary period, it can dismiss that
employee without any procedural due
process."

The doctrine of implied covenant of good faith and fair

dealing in employment contracts was established in Gates v.

Life of Montana (1982), 196 Mont. 178, 638 P.2d 1063, (Gates

I), where this Court stated: "A covenant of good faith and

fair dealing was implied in employee contracts." This Court

went a step further in Gates v. Life of Montana (Mont. 1983),

668 P.2d 213, 40 St.Rep. 1287, (Gates II) holding that the

covenant arises out of the employment relationship and it

exists "apart from, and in addition to, any terms agreed to

by the parties."

7

The Hospital argues to the <u>Gates</u> rule there should be an exception, and the probationary employee is the exception. The Hospital states the doctrine of good faith and fair dealing has the purpose of enhancing job security for the employee. But the probationary employee has little prospect of job security until his trial period has elapsed and attains the status of a permanent employee. The Hospital proposes that the final answer to this issue is found in Storch v. Board of Directors (1976), 169 Mont. 176, 545 P.2d 644. In <u>Storch</u>, the plaintiff was a probationary State employee. The court held the purpose of the probationary status is to provide the employer with a trial period in which unsatisfactory employees may be dismissed without procedural due process.

In light of the <u>Storch</u> decision, the hospital submits it was clear error to instruct the jury that even probationary employees are owed a duty of good faith and fair dealing. We find the <u>Storch</u> decision cannot withstand the scrutiny of the good faith and fair dealing mandate. It was <u>Gates</u> <u>I</u> and not the <u>Storch</u> decision which gave rise to the doctrine of implied covenant of good faith and fair dealing. Furthermore, <u>Storch</u> does not even mention the implied covenant of good faith and fair dealing. The plaintiff-employee in <u>Storch</u> protested his discharge on the grounds of constitutional due process and right to privacy, not on lack of good faith and fair dealing as is the case in the present matter. Accordingly, we hold even in probationary employment relationships, the employer still owes his employee a duty of good faith and fair dealing under <u>Gates</u> <u>I</u>.

In a recent decision, Dare v. Montana Petroleum Marketing Co. (Mont. 1984), ____ P.2d ____, 41 St.Rep. 1735,

Justice Weber defined the parameters of the covenant of good

faith and fair dealing doctrine:

> "Whether a covenant of good faith and fair dealing is implied in a particular case, depends upon objective manifestations by the employer giving rise to the employee's reasonable belief that he or she has job security and will be treated fairly. . . the implied covenant protects the investment of the employee who in good faith accepts and maintains employment reasonably believing their job is secure so long as they perform their duties satisfactorily, such an employee is protected from bad faith or unfair treatment by the employer."

We find the following testimony from the record

constitutes objective manifestations by the Hospital giving

rise to Crenshaw's belief that she had job security:

> "1. That Crenshaw had worked for the respiratory therapy department under Dr. Shaw since approximately April, 1980.
>
> "2. That all of her respiratory therapy work had been done during that period at Bozeman Deaconess Hospital, and her duties, salary, and procedures remained essentially unchanged when the Hospital finally took over the Department.
>
> "3. That Crenshaw was led to believe that she and other long-term staff would come on board with permanent full-time status.
>
> "4. That the Hospital provided permanent, full-time employees with the privilege to join the Hospital group health insurance program. Since the Hospital considered Crenshaw qualified for a health insurance program which only permanent employees could join, the Hospital must have considered her a permanent employee. In addition, the Hospital had a policy of allowing permanent employees a ten percent discount for medical services at the Hospital. Crenshaw received surgical treatment at the Hospital in January, 1982, and she received a ten percent permanent employee discount.
>
> "5. That the Hospital personnel policy requires an evaluation meeting between the probationary employee and his supervisor at the end of the 500 hour probationary period. Crenshaw and two other employees testified that they had no such evaluation meeting at the end of

9

> 500 hours after the merger with Bozeman
> Deaconess Hospital.
>
> "6. That there was no reference to her
> probationary status in either the
> discharge memorandum or in the
> Administrator's letter sustaining the
> discharge."

Crenshaw had reason to believe her job was secure. As an employee she was entitled to the protection of good faith and fair dealing by the Hospital.

Appellant next claims error by the court's refusal of section 39-2-503, MCA, instruction of the "at will" statute. That instruction stated:

> "You are instructed that section
> 39-2-503, MCA provides that employment
> having no specified term may be
> terminated at the will of either party on
> notice to the other. You are further
> instructed that the foregoing statute
> does not require notice prior to
> termination."

The Hospital contends that the Gates II decision of good faith and fair dealing is abrogated by the enactment of the "at will" statute. The Hospital primarily relies on a decision rendered by this Court in 1981, Reiter v. Yellowstone County, Montana (Mont. 1981), 627 P.2d 845, 39 St.Rep. 686, where we held that an implied employment contract cannot circumvent the at-will statute. In Gates I, Reiter was clearly distinguished, ". . . the issue there, [in Reiter], was whether an employee at-will had a property interest in continued employment and was entitled to procedural due process prior to termination. . . We did not reach or decide the good faith and fair dealing issue presented, here. . . " Gates v. Life of Montana Ins. Co., supra, 638 P.2d at 1066. The same holds true in the present case, as Crenshaw is alleging a breach of covenant of good faith and fair dealing.

We hold that the "at-will" statute, section 39-2-503, MCA, is very much alive. The Gates I decision does not preempt the statute. There is no legitimate precedent for an exception for probationary employees. Therefore, Crenshaw even as a probationary employee was owed a duty of good faith under the mandate of Gates I. This requirement of good faith and fair dealing does not conflict with section 39-2-503, MCA, but merely supplements it. Employers can still terminate untenured employees at-will and without notice. They simply may not do so in bad faith or unfairly without becoming liable for damages. The Hospital's notification to the Bozeman Job Service of Crenshaw's unsatisfactory work performance deprived her of employment in the local medical community. This was an act of bad faith. The charges and allegations in the discharge memorandum were false. The charges were serious and resulted in Crenshaw losing her employment as well as jeopardizing her career. This was an act of bad faith. The record shows that Crenshaw's discharge was motivated by bad faith and warrants recovery for breach of implied covenant of good faith and fair dealing under Gates I.

We therefore uphold, instruction 14 that stated probationary employees " . . . may be discharged if they do not measure up to the hospital standards during the probationary period. However, even these employees are owed a duty of good faith and fair dealing. . . " was properly given by the District Court.

The Hospital next claims error by the trial court refusing to give defendant's proposed instruction involving wrongful discharge: "It is only when public policy has been violated in connection with the wrongful discharge that the cause of action arises." The Hospital contends that

11

violation of public policy is a necessary element of the doctrine of good faith and fair dealing which the jury should have been allowed to consider. In support of this contention, the Hospital cites Nees v. Hocks (Or. 1975), 536 P.2d 512; Peterman v. International Brotherhood of Teamsters (1959), 174 Cal.App.2d 184, 344 P.2d 25.

The Hospital is correct that this Court adopted the concept of implied covenant of good faith and fair dealing from the New Hampshire Supreme Court decision of Monge v. Beebe Rubber Co. (1974), 114 N.H. 130, 316 A.2d 549. The decision in Monge was later limited by the New Hampshire Supreme Court to situations where the termination violated public policy. Howard v. Door Woolen Co. (1980), 120 N.H. 295, 414 A.2d 1273. However, the Hospital may not assume that by adopting the earlier New Hampshire decision, this Court will accept the imposed limitation as well.

We have repeatedly stated that a showing of public policy violation is required only to sustain an action for wrongful discharge. "It is only when public policy has been violated in connection with the wrongful discharge that the cause of action arises . . . " Keneally v. Orgain (Mont. 1980), 606 P.2d 127, 37 St.Rep. 154; See also Dare v. Montana Petroleum Marketing Co., supra. The present case is not a case which involves an allegation of "wrongful discharge." The central issue here, is whether there was a breach of duty of good faith and fair dealing. By virtue of Gates I and Gates II, this Court recognizes that liability is not limited to those cases in which a public policy violation has been alleged.

The Hospital next claims error by the trial court's instruction defining negligence. The Hospital argues that negligence is not an issue in the breach of a covenant of

good faith and fair dealing. That negligence is not synonymous with bad faith. Thompson v. State Farm Mutual Automobile Insurance (1972), 161 Mont. 207, 505 P.2d 423; also Gram v. Liberty Mutual Insurance Co. (Mass. 1981), 429 N.E.2d 21.

Crenshaw responds the Hospital's failure to interview all of the witnesses present on the night in question was negligent as a theory separate and distinct from the theory of breach of good faith and fair dealing. Crenshaw offered evidence which raised the question of the Hospital's negligence:

(1) the former acting director testified he had not interviewed all of the appropriate witnesses;

(2) the administrator admitted that he had failed to interview key witnesses and that he was not sure he had interviewed a physician before sustaining the discharge; and

(3) Doctor Vinton, Crenshaw's expert on personnel management, conceded that "when the discharge was made . . . the allegation had not been properly investigated by the Hospital administrator."

In light of the foregoing, we find the Hospital's conduct showed a "want of attention to the nature or probable consequence of the act or omission" and that their conduct fell below the "standard established by law for the protection of others against unreasonable risk." Flansberg v. Montana Power Co. (1969), 154 Mont. 53, 460 P.2d 263; Mang v. Eliasson (1969), 153 Mont. 431, 458 P.2d 777. The allegation of negligence was clearly established in respondent's complaint. We hold the trial court committed no error in issuing the instruction to the jury.

13

The Hospital raises as its next issue for appeal, the testimony of Crenshaw's expert on personnel management, Dr. Karen Vinton. Dr. Vinton testified to the following:

> "1. That there were serious weaknesses in the actions taken by the Hospital in discharging Shirley Crenshaw;
>
> "2. She testified as to the importance of giving an accused employee the opportunity to defend herself in a non stressful situation; of following established disciplinary procedures for investigation and appeal; of carefully documenting disciplinary matters; and of maintaining the appearance as well as the reality of fairness,
>
> "3. That the Hospital failed to properly investigate the charges against her;
>
> "4. That Ms. Crenshaw would have difficulty finding subsequent employment;
>
> "5. That in her opinion, the discharge of Ms. Crenshaw was unjustified."

The qualifications of the expert are well-documented in the record. Dr. Vinton received her Masters in Business Administration and her PH.D in Human Resource Management and Organizational Behavior. She is Assistant Professor of Business Administration at Montana State University. She is a member of the American Associates of Personnel Administrators. Her experience is extensive. She has acted as a consultant to business and research firms. She has taught human resource management to hospital management.

The Hospital moved to exclude her testimony on two grounds: (1) the issue was not the proper subject to expert opinion; and (2) her testimony would constitute comment and argument going to the ultimate issue of this action.

The Hospital contends the testimony of Dr. Vinton has invaded that field of common knowledge to the severe prejudice of the defendants. The employer-employee relationship is within the common knowledge of the average

14

layman. The Hospital goes on to state all persons have been exposed to such a relationship.

The Hospital primarily relies on Ployhar v. Board of Trustees of Missoula (1980), 187 Mont. 363, 609 P.2d 1226. There, parents of a son killed in a heavy equipment operation accident brought a negligence action against school board. An expert testifying for the defendant was allowed to give his opinion as to the cause of the industrial accident. We affirmed the trial court order, stating: "opinion evidence concerning the cause of an accident is admissible only if the subject matter is beyond the ordinary understanding of the jury." We held there was no need for such testimony. In Ployhar, the accident was simple. The evidence was sufficient to allow the jury to make an independent judgment as to the ultimate cause of the accident. The instant case is not a scenario of simple facts. Fault arising from breach of implied covenant of good faith and fair dealing is not easily comprehensible to the average person. Dr. Vinton's testimony was based on professional expertise and experience which the individual jury members were unlikely to possess. Her testimony assisted the trier of fact by providing the jury with information and a prospective beyond the common experience of a lay juror. State of Montana v. Howard (Mont. 1980), 623 P.2d 1226, 38 St.Rep. 1980, see also Demarais v. Johnson (1931), 90 Mont. 366, 3 P.2d 283.

The admissibility of expert testimony is governed by Rule 702, Montana Rule of Evidence:

> "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."

15

Contrary to the Hospital's reading of this rule, Rule 702 does not exclude expert testimony on all matters about which jury members have any knowledge or experience. This Court has long passed the days of when only experts in the field of medicine were allowed to testify. We must continue with the spirit of the new rules of evidence and recognize individuals in other fields, especially the complex domain of labor relations are a new legion of experts. In Barmeyer v. Montana Power Co. (Mont. 1983), 657 P.2d 594, 40 St.Rep. 23, this Court stated:

> " . . . Rule 705, Mont.R.Evid., mandates that the opinion of a qualified expert is admissible, and if opposing counsel believe the opinion is not founded on sufficient data, cross-examination is the shield to guard against unwarranted opinions . . . Stewart v. Casey (1979), 182 Mont. 185, 595 P.2d 1176."

The Hospital's counsel vigorously cross examined Dr. Vinton to determine the extent of her knowledge with respect to hospital management, in particular, personnel policy governing probationary employees.

> "Q. [By Mr. Berg] Well now, let's take it in general, do you know is there a distinction, generally speaking, between the procedure for dismissal of a probationary as distinguished from a permanent employee?
>
> "A. It usually depends on the company's written procedures, but frequently probationary employees are not afforded as much as permanent full-time employees in the discipline procedures.
>
> "Q. Would it be fair to say that a probationary employee may be discharged without reason?
>
> "A. There are companies that do that, yes.
>
> "Q. I see. Do you know what the policy of the Bozeman Deaconess Hospital is with regard to that policy?
>
> "A. As I read it, in the personnel policy, it stated that probationary

16

employees can be discharged without notice.

"Q. I see. So, in Bozeman Deaconess Hospital, that's one of the institutions that make it clear, distinguishes between probationary and permanent employees?

"A. I don't think they make it a very clear distinction --

"Q. They do with notice?

"A. As far as notice, yes.

"Q. Well, they do as far as notice is concerned.

"A. As far as notice, yes.

"Q. Do you know what an at will employee is?

"A. Yes.

"Q. What is an at will employee?

"A. Well, at will the term at will was developed through some legal people basically it means that an employee or an employer can terminate an employment agreement at any time for any reason with no notice."

The trier of fact's experience does not extend to Hospital disciplinary guidelines, much less the ability to evaluate the propriety of such guidelines. We find Dr. Vinton's perspective assisted the jury to understand the evidence and ultimately the breach of implied covenant of good faith and fair dealing question at issue. Further, the Hospital's counsel moved in limine to exclude Dr. Vinton's testimony. The argument was presented to the trial judge. The trial court in its broad discretion admitted the expert testimony. The trial court's order will not be disturbed on appeal in the absence of a clear showing of a manifest abuse of discretion. Yerkich v. Opsa (1978), 176 Mont. 272, 577 P.2d 857; Tigh v. College Park Realty Co. (1967), 149 Mont. 358, 427 P.2d 57; Ployhar v. Board of Trustees (1980), 187 Mont. 363, 609 P.2d 1226, We find no abuse of discretion here.

17

This Court recognized for the first time that the breach of an implied covenant of good faith and fair dealing was a tort for which punitive damages may be awarded. In Gates v. Life of Montana (Mont. 1983), 668 P.2d 213, 40 St.Rep. 1287 we stated: "Breach of the duty owed to deal fairly and in good faith in the employment relationship is a tort for which punitive damages can be recovered if defendant's conduct is sufficiently culpable." The Hospital submits it was clear error to instruct the jury on punitive damages. Crenshaw was discharged on March 12, 1982. The Gates II decision was decided by this Court August 5, 1983. The Hospital advances it was error to assess punitive damages for tortious conduct that was an unknown cause of action at the time of plaintiff's discharge. We disagree. We established the duty of good faith and fair dealing arising out of an employment agreement in Gates I. The Hospital was put on notice to deal in good faith at the time the alleged incident took place. Moreover, negligence on the part of the Hospital's investigation was yet another basis of Crenshaw's cause of action. Section 27-1-221, MCA, provides:

> "In any action for a breach of an obligation not arising from contract where the defendant has been guilty of oppression, fraud or malice, actual or presumed, the jury, in addition to the actual damages, may give damages for the sake of example and by way of punishing the defendant."

Under this statute, it is necessary to prove more than ordinary negligence; such willful disregard of duty amounting to actual or implied malice must be shown. Spackman v. Ralph M. Parsons Co. (1966), 147 Mont. 500, 414 P.2d 918; Cashin v. Northern Pacific Ry. Co. (1934), 96 Mont. 92, 28 P.2d 862.

Crenshaw asserts the maliciousness of the Hospital's conduct stemmed from the Hospital removing the "arterial

blood gas" certificate from her personnel file and fabricating charges against her. The record sustains that the Hospital failed to properly investigate the charges. In a medical community such as Bozeman, charges of such a nature should not have been raised without careful consideration of the consequences to one's professional livelihood and reputation. This, we hold, is the degree of culpability the Gates II, decision was to prevent.

We find the evidence set forth by Crenshaw presented an issue of punitive damages. The issue was properly submitted to the jury.

The judgment of the District Court is affirmed.

_John Conway Harrison_
Justice

We concur:

_Frank I. Haswell_
Chief Justice

_Daniel J. Shea_

_John C. Sheehy_

_Fred J. Weber_

_Gene B. Daly_

Justices

Mr. Justice L. C. Gulbrandson:

I specially concur in the result.

_L. C. Gulbrandson_
Justice

19