No. 91-020

IN THE SUPREME COURT OF THE STATE OF MONTANA

1991

BRUCE SCOTT,

      Plaintiff and Appellant,

-vs-

EAGLE WATCH INVESTMENTS, INC.,
a Montana Corporation, and PETER BOUMA,

      Defendants and Respondents.

FILED

DEC 19 1991

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:    District Court of the Fourth Judicial District,
In and for the County of Missoula,
The Honorable John S. Henson, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        P. Mars Scott; Mulroney, Delaney & Scott, Missoula,
Montana.

    For Respondents:

        Edward A. Murphy; Datsopoulos, MacDonald & Lind,
Missoula, Montana.

                Submitted on Briefs:  October 31, 1991

                        Decided:  December 19, 1991

Filed:

_____
Clerk

Justice John Conway Harrison delivered the Opinion of the Court.

Appellant Bruce Scott (Scott) appeals from the judgment of the District Court of the Fourth Judicial District for Missoula County, Montana. The court held that Scott breached his oral employment contract and was properly terminated from his job as an athletic club manager, requiring him to pay respondent/employer Peter Bouma (Bouma) $755.81 with interest. We affirm.

The appellant takes issue with the District Court's Findings of Fact, Conclusions of Law, and Judgment almost in their entirety. We address only the following dispositive issues:

I. Whether the District Court erred in concluding that an at will employment relationship existed between the parties.

II. Whether the District Court erred in concluding that the employer did not breach the implied covenant of good faith and fair dealing when he terminated the employee.

The history of this action spans nearly ten years and began sometime in 1980 when Bouma began researching investments which would provide him with tax advantages. Bouma became aware of a defunct athletic club located east of Missoula and considered it a potential investment. Through conversations with Scott, Bouma became acquainted with Scott's previous involvement with a Missoula tennis club known as Garden City Racket Club which failed after only three months of operation in early 1980. The two men began informal talks about the possibility of opening a full service athletic club (The Club) at the site of the defunct athletic club east of Missoula. They made inquires with financing entities and researched the existing liens

2

on the property. Bouma and Scott toured other athletic clubs in the State of Montana. Bouma also traveled to Spokane, Washington to observe another athletic club operation.

Bouma contributed approximately $787,000 in capital to purchase The Club. He pledged the necessary collateral to obtain financing. Although Scott contributed his past experience in the area of tennis and with the failed Garden City Racket Club, he contributed no capital to the venture.

As the venture began to materialize, Bouma and Scott discussed the idea that Scott become the general manager of The Club. The parties met at various times and drafted an employment agreement. Both parties acknowledged that various parts of the agreement were not acceptable and consequently they did not sign the agreement. Although the agreement remained unsigned, the parties made compensation arrangements which involved splitting the monthly net profits of the operation after some adjustments such as depreciation. Additionally, the parties agreed that Scott would act as the general manager in charge of operations on a day-to-day basis, monitoring all aspects of The Club.

In preparation of the venture, both parties worked in various capacities to accomplish everything necessary to open The Club. Construction plans were made, approved and implemented; mechanics liens were removed; zoning problems were addressed; a staff was hired; a promotional campaign was initiated; and equipment was purchased.

On December 15, 1981, The Club membership roster immediately filled to capacity with approximately 1,200 members, and the facility

3

opened on January 15, 1982. With such a large turnout the parties employed the Dobbins accounting firm to compile monthly financial statements and help in the billing process. The record indicates that due to the volume of financial transactions various problems were encountered with the financial records especially since all transactions were initially handled manually at The Club.

Bouma and Scott met on a regular basis to discuss the progress of The Club and work out problems. Bouma, who was financially at risk for the venture, was understandably interested in the financial elements of The Club. Bouma requested basic financial information from Scott such as the amount of accounts payable and receivable. Although Scott was the on site general manager in charge of the employees who handled the income and expenses of The Club, Scott continually referred Bouma to the Dobbins firm and simply presented The Club's financial picture as positive. Scott did not provide Bouma with even the most basic list of accounts payable and receivable as requested.

Bouma later became aware of other problems at The Club such as lack of cleanliness, an unauthorized gift of a free lifetime membership (which was not discovered until after Scott's termination), and lack of policy development. He also learned of an unpaid invoice when a supplier contacted him at home indicating that delivery would be suspended unless the account was brought current. Bouma became increasingly frustrated with Scott's performance, particularly in the financial area. In view of Bouma's investment and Scott's performance deficiencies, Bouma considered termination but postponed

4

such action pending a financial report from the Dobbins firm.

On June 13, 1982, Bouma made an appointment with Scott for the following day to assure his availability. That same day, Scott went to see Bouma and stated that The Club's bills were paid and there was money in The Club's checking account. The next day Bouma acquired the financial report from the Dobbins firm which confirmed that The Club's bank account was overdrawn, numerous outstanding accounts payable existed, and that Scott had taken two cash withdrawals totalling approximately $13,000. In view of Scott's performance deficiencies, Bouma terminated him that day. Due to the financial state of The Club, Bouma borrowed an additional $25,000 to meet existing operating expenses.

Scott initiated suit on a variety of theories requesting monetary relief including punitive damages, but primarily seeking damages of $720,000 in lost profits due to his termination. The District Court found that Scott was an at will employee and that Scott breached the oral employment agreement. The court also found that Bouma was justified in terminating Scott and ordered Scott to pay Bouma $755.81 plus interest to compensate Bouma for draws Scott took as over-payment.

STANDARD OF REVIEW:

The trier of fact is in the best position to hear the testimony and observe the witnesses and their demeanor, therefore, on appeal, we will not overturn the findings of fact unless they are clearly erroneous. Morin v. Mapston (1985), 217 Mont. 403, 407, 705 P.2d 118, 120; Rule 52(a), M.R.Civ.P. "Particularly where credibility of witnesses is involved, we give great weight to fact-findings of

5

a district court." Morin, 217 Mont. at 407, 705 P.2d at 120. We will not overturn the conclusions of law unless they are incorrect. Steer, Inc. v. Dept. of Revenue (1990), 245 Mont. 470, 474, 803 P.2d 601, 603.

ISSUE I. Did the District Court err when it found that an at will employment relationship existed between the parties.

Today, the concept of at will employment or the "employment at will rule" is deceptively simple. The employment at will rule has been defined as follows: when "an employer may dismiss an at-will employee for a good reason, bad reason, or for no reason at all." Henry H. Perritt, Jr., Employee Dismissal Law and Practice, p. 1 (2d ed. 1987). Montana has implemented protective devices through both the legislature and case law that operate to curb the harsh effects of the rule. Prout v. Sears (1989), 236 Mont. 152, 157, 772 P.2d 288, 291 (decided on pre-Wrongful Discharge Act law and provides for four exceptions to the termination at will rule; also see Montana's Wrongful Discharge Act §§ 39-2-901 et seq., MCA, enacted in 1987). These devices however do not obliterate the at will rule. Medicine Horse v. Trustees, Big Horn County School Dist. (No. 91-090, decided December 10, 1991), ___ P.2d ___, ___ St.Rep. ___.

In the case at bar, the record indicates that while the parties met and contemplated a written employment agreement with a term of five years, a contract to that effect was never finalized. The parties each indicated that they wished to make various revisions to the agreement and therefore did not sign the agreement. Section 28-2-

6

903(1)(a), MCA (1981), states:

> The following agreements are invalid unless the same or some note or memorandum thereof is in writing and subscribed by the party to be charged or his agent: (a) an agreement that by its terms is not to be performed within a year from the making thereof; . . .

We have previously stated that "[t]he word 'invalid,' as employed in these statutes, means void; of no force or effect. Therefore the contract cannot be relied upon or furnish evidence for any purpose." Mahoney v. Lester (1946), 118 Mont. 551, 560, 168 P.2d 339, 343; citing Dreidlein v. Manger (1923), 69 Mont. 155, 163, 220 P. 1107, 1109. Here neither party signed the agreement committing them to a specified employment term. Therefore, under the facts of this case the agreement of employment is an at will employment relationship.

ISSUE II. Did the District Court err in concluding that Bouma did not breech the implied covenant of good faith and fair dealing when he terminated Scott.

In Montana, termination of an at will employment relationship is governed by § 39-2-503, MCA, which provides that "an employment having no specified term may be terminated at the will of either party on notice to the other. . . . " Supplementing this statute is our opinion of Crenshaw v. Bozeman Deaconess Hosp. (1984), 213 Mont. 488, 693 P.2d 487, in which we said that an employer owes even a probationary employee a duty of good faith and fair dealing. In Crenshaw, we stated that "[e]mployers can still terminate untenured employees at-will and without notice. They simply may not do so in bad faith or unfairly without becoming liable for damages." Crenshaw,

7

213 Mont. at 498, 693 P.2d at 492.

With this in mind we look to the facts of the case at bar. First, Scott insists that the termination notification requirements set forth in the draft of the employment contract should be followed. However since the contract was never signed the provisions of the contract governing notice are not controlling. Instead, the notice requirements of § 39-2-503, MCA, are determinative; no prior notice is required. Gates v. Life of Montana Ins. Co. (1982), 196 Mont. 178, 185, 638 P.2d 1063, 1067. In the case at bar, Bouma properly followed the notice requirement when he informed Scott that their employment relationship was terminated.

Secondly, much is also made of whether The Club was profitable from its date of opening until Scott's termination, a period of about six months. The parties hotly contested the profitability issue and numerous calculations with various inclusions and exclusions were presented at trial. The lack of profitability was again one of the written contract provisions under which Bouma could terminate the employment relationship. We have already stated that the contract provisions cannot control since they were not the final expression of the parties as evidenced by its lack of signatures. We take time to point out that the profitability of The Club was only one factor in Scott's termination. If the profitability issue was the sole reason for termination, we must look to the belief of the employer at the time of termination. If the termination was rooted in a mistaken belief, "[e]ven an honest, though mistaken, belief that the employer for legitimate business reasons had good cause for the discharge would

8

negate bad faith." Heltborg v. Modern Machinery (1990), 244 Mont. 24, 37-38, 795 P.2d 954, 962; citing Pugh v. See's Candies, Inc. (Cal. 1988), 203 Cal.App.3d 743, 770, 250 Cal.Rptr. 195, 213.

Important to the issue of bad faith in the case at bar, is that the record indicates that Bouma chose to terminate the at will employment relationship due to various deficiencies in Scott's performance. Accordingly, the District Court stated in Findings of Fact #33 that:

> [B]ouma began to question Scott more closely about payables, policies and money. Scott was nonresponsive and nonproductive. Often when Bouma went into the facility he would see Scott on the courts playing tennis. Bouma began to show his dissatisfaction with the way he was being put off, but Scott was either unconcerned about that or did not recognize it. The former is probably the case since a reasonable manager would know why his employer kept asking the questions and that his employer expected informed responses. Scott should have been prepared to give the information that Bouma wanted. Bouma's requests were reasonable and confined to the things that a person with overall responsibility for a business ought to know.

Further, the District Court's Conclusions of Law #7 follows the same train of thought:

> [Bouma] had fair and honest reasons to discharge Bruce Scott from employment. He was non-responsive when the employer made reasonable demands for information relating to the financial condition of the business. He failed to write and implement policies for the conduct of the business as requested by the employer. He made unauthorized draws of money. He jeopardized the business by withdrawing large sums of money for his own use when the funds were intended to act as working capital. He failed to fulfill his responsibilities to set up an accounting system. He failed to maintain the level of cleanliness expected by the customers of the business. He allowed payables to go unpaid. Under his management, membership levels declined. Under his management, the business ran out of cash. All of the foregoing happened in a five month period. Such events would give any employer a fair and honest reason to terminate a manager.

9

Scott's own testimony supports the court's statements particularly with regard to the cash balances of The Club and the large draws taken by Scott. Scott acknowledged the progressively declining cash balance of The Club's checking account and stated that he maintained possession of the checking register in his desk which he consulted "on a regular basis." Despite this knowledge, when The Club was only a few months old and cash flow streams were unproven and unpredictable, Scott took draws totalling over $13,000 in cash. Additionally, Scott testified that he was directly responsible for the information that went to the Dobbins firm, but declined to take responsibility for the information. Scott neglected to monitor The Club's basic income and expenses and failed to obtain such information when requested. Further, Scott did not correct this performance problem which was critical especially for assessing the viability of a new business, and referred Bouma to the Dobbins firm. Section 39-2-404, MCA provides:

> [A]n employee must substantially comply with all the directions of his employer concerning the service on which he is engaged, except where such obedience is impossible or unlawful or would impose new and unreasonable burdens upon the employee.

We conclude that obtaining a list of accounts payable and receivable from invoices and checks received at The Club and reviewed by the manager was possible and within the capability of the general manager. Overall, Scott did not fulfill the basic functions of a general manager and Bouma honestly believed his interests were being mishandled. Bouma took steps to correct the problem and was justified in terminating Scott. Under the circumstances, the District Court

10

did not err in concluding that Bouma did not violate the covenant of good faith and fair dealing when terminating Scott from the at will employment relationship.

In the case at bar, we find that the court's Findings of Facts were supported by the record and were not clearly erroneous. The court also made correct Conclusions of Law. Therefore, we will not disturb the court's ruling. Affirmed.

_____
Justice

We concur:

_____

_____

_____

_____
Justices

11

December 19, 1991

## CERTIFICATE OF SERVICE

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:


P. Mars Scott
Mulroney, Delaney & Scott
P.O. Box 8228
Missoula, MT  59807

Edward A. Murphy
Datsopoulos, MacDonald & Lind
201 W. Main, Ste. 201
Missoula, MT  59802


ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY: _____
    Deputy