No.   93-078

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993

MARY M. TONDU,

       Plaintiff and Appellant,

  -v-

WALTER S. "PETE" AKERLEY,

       Defendant and Respondent.

APPEAL FROM:   District Court of the Fifth Judicial District,
In and for the County of Beaverhead,
The Honorable Frank M. Davis, Judge presiding.

COUNSEL OF RECORD:

       For Appellant:

          Max A. Hansen, Max A. Hansen & Associates, Dillon,
Montana

       For Respondent:

          Robert Edd Lee, Crowley, Haughey, Hanson, Toole &
Dietrich, Billings, Montana

FILED

Filed: JUN 23 1993

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

Submitted on Briefs:   May 13, 1993
Decided:   June 23, 1993

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

This is an appeal **from** a Fifth Judicial District Court, Beaverhead County, judgment in a bench trial. We affirm.

There are two issues on appeal:

1. Did the District Court err in concluding that a partnership did not exist between Mary Tondu and Walter Akerley?

2. Did the District Court equitably distribute the funds at issue?

Mary M. Tondu (Mary) and Walter S. "Pete" Akerley (Pete) met in late 1988. They had similar interests in raising cattle and soon verbally agreed to enter into business together to raise purebred registered cattle. Each of the parties contributed assets, monetary and otherwise, to begin the enterprise. Both parties contributed their knowledge, skills, and experience toward the management and operation of the business. They were to have equal one-half interests in the business.

Mary and Pete also entered into a domestic relationship, living together and conducting their business in a rental property in Sheridan. During this time, each party also devoted time to separate pursuits and other employment.

Wages from these other income sources were added to monies from the business. Mary and Pete also took out joint loans to finance their operation. Mary and Pete had a **joint** checking account, a joint savings account, and two separate checking accounts, owned individually. In fact, monies from all income

sources were commingled within the 4 accounts and used to pay business and personal expenses.

Although they shared their incomes and their business interests, they filed separate income tax returns during their venture together, instead of a partnership tax return. Mary indicated that the couple's accountant advised her that filing separately was the appropriate method for filing their returns.

In the spring of 1991, the personal relationship was terminated and in April, Mary moved to Arizona. The parties tried to terminate their business relationship as well, but they encountered problems, and Mary filed this action on January 27, 1992.

The trial court concluded that no partnership was established. Mary was entitled to the sum of $2,750, together with her share of the allocated interest. Brian Barragree, who performed some work for the couple, was owed $1,000, and the remainder of the money from the sale of the business assets sold at the termination of the relationship and deposited with the Clerk of Court, was awarded to Pete. The total account was approximately $14,000. Mary appeals.

Our standard of review of a district court's findings of fact is clear. Rule 52(a), M.R.Civ.P., provides in pertinent part:

> Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses...

In interpreting this rule, we have adopted the following three-part test:

> First, the Court will review the record to see if

3

the findings are supported by substantial evidence. Second, if the findings are supported by substantial evidence we will determine if the trial court has misapprehended the effect of evidence. Third, if substantial evidence exists and the effect of the evidence has not been misapprehended, the Court may still find that "[A] finding is 'clearly erroneous' when, although there is evidence to support it, a review of the record leaves the court with the definite and firm conviction that a mistake has been committed."

Interstate Production Credit v. DeSaye (1991), 250 Mont. 320, 323, 820 P.2d 1285, 1287. (Citations omitted.)

## ISSUE I. FORMATION OF PARTNERSHIP

In her complaint, Mary asserts that she and Pete formed a partnership and at its dissolution, Pete must make an accounting and pay her for her share of the partnership assets. Pete contends that they had a cooperative business relationship and he has fully compensated Mary for her share of the assets.

Section 35-10-201(1), MCA, defines a partnership as "an association of two or more persons to carry on as co-owners a business for profit." Barrett v. Larsen (1993), 50 St. Rep. 96, 846 P.2d 1012, provides the following elements as indicative of a partnership:

> To establish . . . a partnership, it is necessary to determine the intent of the parties: such business relationships arise only when the parties intend to associate themselves as such. There must be some contribution by each co-adventurer or partner or something promotive of the enterprise. There must be joint proprietary interest and a right of mutual control over the subject matter of the enterprise or over the property engaged therein, and there must be an agreement to share the profits. The intention of the parties has to be clearly manifested, and must be ascertained from all the facts and circumstances and actions and conduct of the parties. (Citations omitted.)

Barrett, 846 P.2d at 1015.

4

A. Clear Manifestation of Intent to Establish a Partnership

In Antonick v. Jones (1989), 236 Mont. 279, 769 P.2d 1240, we pointed out that "[t]he initial test of whether a partnership exists is the intent of the parties. This inherently implies a mutual agreement or meeting of the minds." Antonick, 769 P.2d at 1242-1243. (Citation omitted.)

The element of intent to associate as partners in this instance is highly debatable. Pete testified that "I wouldn't have considered a partnership." He also asserted, when asked why by the court, "Your Honor, I think a partnership has to be equal donations and equal service. I've been in comparably the same situations previous, and I've never seen them work. And I wasn't about to get into another one." Section 35-10-401(7), MCA, states that "[n]o person can become a member of a partnership without the consent of all the partners." In this case, there is direct testimony that one of the alleged partners did not wish to be associated in a partnership.

Moreover, there is other evidence to support Pete's argument that he did not want to form a partnership with Mary. Although the two parties used the Diamond Dot brand, owned by Pete, it was never transferred to the partnership. Mary was a signer on the brand, not a co-owner.

Although Mary stated that they conducted business under the name of "Akerley and Tondu" or Akerley and Tondu d/b/a "Diamond Dot Ranch" or "Diamond Dot Angus", they never registered the name of their partnership with the Secretary of State. They also never put

5

into writing their desire to associate in a partnership.

Further, they filed separate tax returns instead of partnership returns. The intention of the parties to form a partnership is not clearly manifested as required.

### B. Contribution and/or Promotion of the Enterprise

Each party made a contribution to start the business. The trial court stated that Mary contributed about $12,000 and some of her shorthorn cattle to the enterprise and Pete contributed about $3,000 in cash and **"his** knowledge and experience in the unique business of transplants and artificial insemination." The parties obtained joint loans and jointly purchased cattle and necessary equipment to facilitate their operation. Both parties were involved in the operation and management of the business. From the testimony elicited, it is clear that both parties put considerable effort into promoting this enterprise.

### C. Right of Mutual Control

In the pre-trial order, the agreed statement of facts states that **"[b]oth** of the parties actively participated in purchasing and marketing their livestock." For instance, during the Labor Day weekend of 1991, Pete and Mary met with Walter Perkins and Floyd Fredrickson about the sale of some of their cattle. Pete had earlier arranged the meeting with Walter Perkins. Mary arranged to have some of the cattle cared for and taken to the winter fair for show by some Sheridan high school students for possible sale at a later date.

When Mary's attorney asked Floyd whether he was dealing with

<u>both</u> Mary and Pete concerning the sale of cattle, Mr. Perkins stated, "Yes." From the testimony presented, Mary and Pete maintained mutual control over the animals.

### D. Agreement to Share Profits

The trial court's findings of fact concerning sharing of profits stated:

> The parties had no agreement expressed or implied as to the sharing of the financial benefits of their business relationship. Indeed there was little, if any profit as the term is commonly used in a joint business venture. It is apparent from the record that the enterprize (sic) was aesthetically mutually satisfying, and supplemented their individual incomes, providing them a good living during the short-lived association. Even Mary's daughter was advanced money and otherwise benefitted from the relationship. Repeatedlytheparties withdrew money from the business accounts for their respective personal use. In November, 1989, Mary actually repaid a $4,500 loan which had been negotiated by Pete, from her own personal account. Pete contributed $1,700 from his personal account to purchase a tractor and horse. Once Mary withdrew $775 from joint funds to supplement the purchase by her of an automobile. Neither party ever objected to this co-mingling [sic] and joint personal use of these assets.

Mary and Pete both stated that they had no agreement as to sharing profits. When asked about any agreement to share profits, Pete testified, "No. Just pool our money. It was just an oral agreement. We would pool and just go on." Further testimony revealed that money from cattle sales would be deposited into any account at any time and may have been used by Mary or Pete or jointly by the two. This is a second element of a partnership that the Tondu-Akerley business relationship cannot meet; there was no agreement between the parties to share profits.

The burden of establishing a partnership is on the party

claiming one. Antonick, 769 P.2d at 1242. We conclude that Mary has failed in her burden of proof, and we hold that the cooperative business association entered into by Mary Tondu and Walter "Pete" Akerley does not contain the elements necessary to establish a partnership.

This Court notes that a side issue existed which reflected upon Mary's credibility and her contention that she and Pete had established a partnership. There were a number of checks written on Pete's individual checking account which purportedly contain Pete's signature but do not appear to be in Pete's handwriting. Mary repeatedly denied signing these checks but the trial court concluded that:

> Mary wrote checks on Pete's account, signing his name. While Mary now denies that she did this, the evidence was persuasive that she did. Pete now denies that he authorized these checks, the evidence however convinces the Court that he at least knew or should have known about it. In any case the so called unauthorized checks amounted to less than $2,000.

"The trier of fact is in the best position to hear the testimony and observe the witnesses and their demeanor....Particularly where credibility of witnesses is involved, we give great weight to fact-findings of a district court." Scott v. Eagle Watch Investments, Inc. (1991), 251 Mont. 191, 195, 828 P.2d 1346, 1349. The trial court was in the best position to determine whether Mary was credible, and we give its decision due regard.

ISSUE II. EQUITABLE DISTRIBUTION OF ACCOUNT

As a final issue, Mary seeks a determination as to whether an equitable distribution of the funds was effected. "[A] court of

8

equity will, when its jurisdiction has been invoked for an equitable purpose, proceed to determine any other equities existing between the parties connected with the main subject of the suit, and grant all relief necessary to an entire adjustment of such subject." Tiffany v. Uhde (1950), 123 Mont. 507, 512-513, 216 P.2d 375, 378.

Pete's attorney, in moving the court for a judgment upon the evidence at the close of the hearing, stated:

> . ..that Mary Tondu is entitled to the proceeds from cow NO. 161 sold to Fredrickson. . ..that Mary Tondu is entitled to registration and entry fees which Pete Akerley agreed to pay her during the Labor Day weekend of 1991 in the approximate amount not exceeding $2,000, except for Cow No. 161, which was her cow and upon which she ought to pay her own fees....

However, in his post-trial supplemental findings and conclusions, Pete states that Mary should be awarded $849.75 for registration and other expenses incurred on the sale of Akerley cattle after the settlement in June 1991. He also argues that there was no transfer of Cow 161 and therefore, no money owed for the animal.

Mary states, in her final proposed findings of fact and conclusions of law and her additional brief in support of the final proposal, that she is entitled to have the partnership capital accounts equalized. According to Mary, she should receive the balance of the approximately $14,000 on deposit with the Clerk of Court after Brian Barragree is paid the $1,000 owed him for his work. She also claims an additional payment of $10,900 is necessary to "reimburse her for her excess capital contributions."

9

The trial court, in its findings of fact, stated that, among the unfinished business between the two parties, were Mary's expenditures during the 1991 Labor Day weekend. It concluded that registration and entry fees and other costs of approximately $2,000 were incurred by Mary.

The judgment, filed on September 10, 1992, awarded Mary the sum of $2,750 and her allocated share of the interest. Pete Akerley was awarded the remainder of the trust after Brian Barragree, a fitter the couple hired to prepare some of their cattle for sale, was paid $1,000 for work performed. We conclude that the trial court effected an equitable settlement.

In conclusion, the findings of fact are supported by substantial evidence, the trial court did not misapprehend the effect of the evidence and the findings are not clearly erroneous. AFFIRMED.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Justices

10

June 23, 1993

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:


Max A. Hansen, Esq.
Max A. Hansen & Associates, P.C.
P.O. Box 1301
Dillon, MT 59725

Robert Edd Lee, Esq.
Crowley, Haughey, Hanson, Toole & Dietrich
P.O. Box 2529
Billings, MT 59103


ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY:_____
    Deputy