[No. A099228. First Dist., Div. One. Jan. 28, 2004.]

DEE KOTLA, Plaintiff and Appellant, v.
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, Defendant and
Appellant.

[No. A100918. First Dist., Div. One. Jan. 28, 2004.]

DEE KOTLA, Plaintiff and Respondent, v.
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, Defendant and
Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION‡]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part III of the Discussion.

**COUNSEL**

Law Offices of Ellen Lake, Ellen Lake; Gwilliam, Ivary, Chiosso, Cavalli & Brewer, J. Gary Gwilliam and Jan C. Nielsen for Plaintiff and Appellant and for Plaintiff and Respondent.

Janet G. Tulk, Kathryn A. Rauhut; Littler Mendelson, Henry D. Lederman, Eric A. Grover and Barbara M. Russell for Defendant and Appellant.

OPINION

**MARGULIES, J.**—Following a jury trial, plaintiff Dee Kotla obtained a judgment for wrongful termination against the Regents of the University of California, doing business as the Lawrence Livermore Laboratory (Lab). The primary issue on appeal is whether the trial court committed prejudicial error by allowing a human resources management expert to opine that certain facts in evidence were "indicators" that the Lab discharged Kotla for retaliatory reasons. We hold that the expert's testimony was improper and prejudicial, and reverse the judgment.

## BACKGROUND

Dee Kotla had worked for the Lab for 14 years before she was terminated in 1997. At the time of her discharge, she was working as a computer support technician in the Lab's Administrative Information Systems (AIS) Department, providing network and server maintenance services for the Lab's Plant Engineering Department.

Kotla was concerned about gender and departmental pay disparities among Lab employees and had raised that issue in meetings with management. Kotla also became an advocate for a Lab secretary she supervised, Kim Norman, who spoke with Kotla about sexual harassment she was experiencing from a male manager named Charlie Brown. Kotla helped Norman to bring her harassment complaints to the attention of management.

Norman eventually sued the Lab for damages arising from Brown's sexual harassment (the *Norman* case). Gabriela Odell was assigned as in-house counsel for the Lab to handle this case. Odell had her paralegal interview several potential witnesses who worked for the Lab, but did not request that Kotla be interviewed. According to Odell, she did not request Kotla to be interviewed because Kotla had no firsthand knowledge pertaining to the *Norman* case. Norman's attorney took Kotla's deposition in December 1996. Odell did not attempt to meet with Kotla before the deposition, and she informed Norman's counsel at its outset that she was not representing Kotla. Kotla, who had heard that other employees were represented by the Lab counsel at their depositions, was surprised and alarmed to learn this.

Kotla came to the deposition with Robert Fornaciari, a retired lab employee. She testified that Fornaciari was her "partner," that he did consulting work for an entity called Spectrum Consulting, and that she did some programming work in connection with that business. Kotla was married and having an affair with Fornaciari at the time. Kotla was bothered by the questions she was being asked about Fornaciari and Spectrum because she

felt they were not relevant to the *Norman* case and believed an attorney should be representing her. During a break in the deposition, Kotla overheard Odell tell another defense attorney in the women's restroom, "[I]f Kotla knew what was good for her, she would shut up."

Kotla brought to the deposition three pages of typewritten notes she had made about Brown's harassment of Norman. She stated that the notes had been prepared contemporaneously as the events occurred and that she had stored them on the Lab computer file server, in a file named "Kim." Kotla was asked at the deposition to provide her computer password so the attorneys present could determine when the notes had been created and modified. Kotla refused to furnish the password without permission from her supervisor. At a break in the deposition, Odell contacted the head of Kotla's department, David Seibel, to authorize Kotla to disclose her password. Seibel did so. During Odell's conversation with Seibel she told him that Kotla was a "hostile witness." Odell also expressed concern that the computer files on the server could be modified or deleted. After the call, Seibel had Kotla's work computers secured and a snapshot taken of the files on Kotla's computer file server.

Seibel faxed the snapshot to Odell while Kotla's deposition was still in progress. Odell noticed that the snapshot showed a file folder entitled "Spectrum." Since Kotla had just testified that she performed work for an outside company called Spectrum Consulting, it occurred to Odell that Kotla might be violating Lab policy by misusing Lab computers for outside work.

The deposition was adjourned for the day when Kotla refused to continue without counsel present to represent her. After the deposition, Odell immediately reported her suspicion about possible computer misuse to the head of the Lab's Office of Investigative Services (OIS). Lab policy required incidents of computer misuse to be reported to OIS. OIS requested Kotla's supervisor to remove the office computers she used to a locked room until they could be examined by OIS. OIS arranged for a Lab police officer and a computer security specialist to investigate whether Kotla had used the Lab's computers to perform work for an outside business. OIS first informed Kotla of the investigation by voicemail message left for her on December 17.

Kotla, who took a few days off after the deposition, came back to the Lab after hours on December 18. Although OIS had disabled her personal password, she was able to access the computer server using a special administrative password. At 10:51 p.m. on the evening of December 18, Kotla deleted the "Spectrum" files and her other personal files, leaving only the "Kim" files on the server. However, copies of the deleted files remained on Kotla's two office computers, which had been locked up due to the investigation.

OIS interviewed Kotla. She admitted using Lab computers to assist Fornaciari, without pay, on three projects. Kotla also admitted deleting the "Spectrum" and other files on December 18. However, she denied being aware of the OIS investigation on that date, and stated that she deleted the files because she was concerned about retaliation for her role in the *Norman* case and did not want Odell to have access to personal files unrelated to that case.

OIS prepared a detailed investigation report which was forwarded to the Lab's Staff Relations Division (Staff Relations). Beverly Thomas of Staff Relations reviewed Kotla's telephone records, which showed that Kotla placed 75 telephone calls to Fornaciari from the Lab between June and December 1996. Thomas also reviewed a summary chart showing how the Lab had handled other computer misuse cases. The chart showed that: (1) of eight employees who had downloaded pornography onto Lab computers, seven had received warning letters or short suspensions and one had resigned; (2) two employees who provided non-Lab personnel with user accounts on Lab computers received 20-day suspensions; and (3) four employees who had used Lab computers for outside business had resigned.

The information gathered by OIS was transmitted to Kotla's manager, David Seibel, who was responsible for recommending to Staff Relations the disciplinary action to be taken. Seibel also reviewed a report prepared by Thomas summarizing Kotla's telephone records and stating that "[i]n [all] prior computer misuse cases [at the Lab], when outside business activity was an issue, employees were dismissed." Before finalizing his decision, Seibel spoke with Kotla by telephone to explain his view of the serious nature of the charges in the OIS report and to get her reaction to them. According to Seibel, Kotla did not explain or apologize for her actions. Kotla stated that Seibel did the talking in that telephone conversation and did not give her an opportunity to explain her side of the story.

A few days after speaking with Kotla, Seibel wrote to Robert Perko, head of Staff Relations, recommending Kotla's dismissal. Seibel's letter cited the following facts: "Ms. Kotla has admitted that she used [the Lab] computer assigned to her to do work for a private firm. Evidence also strongly suggests that she used [the Lab] telephone assigned to her to conduct work for this firm. Ms. Kotla also, during off working hours, removed files from her computer system which were relevant to the investigation of this matter."

Perko concurred in Seibel's recommendation, and notified Kotla in writing of the Lab's intent to dismiss her from employment on February 20, 1997 based on her "misuse of government property and breach of ethical standards of honesty, integrity and trust." She was afforded an opportunity to appeal the

decision, which she did in writing through a representative on April 4, 1997. Perko notified Kotla of her dismissal on April 15, 1997.

Kotla sued the Lab and proceeded to trial on the theory that her termination violated the antiretaliation provisions of the Fair Employment and Housing Act (FEHA), Government Code section 12940 et seq. After seven days of deliberations, the jury returned a verdict for Kotla, nine jurors voting in favor, for $325,000 in economic damages and $675,000 in emotional distress damages.

Following entry of judgment, the Lab moved for a new trial on the ground, in part, that the jurors committed misconduct by agreeing to augment the verdict to include attorney fees. The trial court ordered a new trial as to damages only unless Kotla consented to a remittitur of the noneconomic damages award from $675,000 to $420,000. Kotla consented to the remittitur. The Lab timely appealed from the ensuing judgment (case No. A099228) and Kotla cross-appealed from the order granting a new trial on damages.[1] The Lab also appeals from a separate postjudgment order awarding attorney fees to Kotla (case No. A100918). We have consolidated the two appeals for briefing, argument, and decision.

## DISCUSSION

### I. Expert Testimony

The Lab contends the trial court erred in permitting Kotla's human resources management expert to testify that: (1) certain predischarge events were "indicators" of the Lab's retaliatory motive in discharging Kotla; (2) his opinions were based in part on a detailed comparative analysis of previous computer misuse cases at the Lab that the trial court had ruled were irrelevant and inadmissible; and (3) the Lab should have conducted a more thorough investigation of Kotla's retaliation claim and should have selected a more appropriate level of discipline for her admitted computer misuse. We agree, in part, with the Lab's contentions.

Kotla's expert witness, Dr. Jay Finkelman, holds a Ph.D. in industrial psychology. His professional background included service as an in-house supervisor and outside consultant to many corporate human resources departments. In those capacities, he oversaw or personally conducted investigations of retaliation, discrimination, and harassment complaints. Dr. Finkelman also

---

[1] Kotla's notice of cross-appeal also includes a protective cross-appeal from the judgment in relation to certain interim orders. However, Kotla has waived its purported protective cross-appeal by offering no argument in support of it.

taught industrial psychology and human resources as a tenured and adjunct university professor, including courses on handling retaliation complaints, and has published widely on human resources issues.[2]

## A. *Retaliation Opinions*

The Lab moved in limine to preclude Dr. Finkelman from offering an opinion that Kotla's termination was retaliatory, arguing such testimony would not assist the jury and would supplant the jury's role as fact finder. The trial court ruled Dr. Finkelman could not testify about the "ultimate issue" of whether the Lab retaliated against Kotla. However, just before calling Dr. Finkelman to the stand, Kotla sought a determination that this ruling did not preclude the expert from testifying that certain facts in evidence were "indications" or "evidence" of a retaliatory motive on the Lab's part. Although observing there was a "very fine line" between Dr. Finkelman's proposed testimony and the type of opinion testimony barred by its earlier ruling, the trial court allowed Kotla to proceed with the testimony, reserving its discretion to sustain objections to specific questions.

Over the Lab's objections, Dr. Finkelman was allowed to testify about the significance of various facts in evidence as follows: (1) the Lab counsel's failure to interview Kotla in connection with the *Norman* case "is indicative of [an employer] who is trying to either avoid or mislead, in my opinion, as to what that testimony is going to be"; (2) the *Norman* case was important in establishing evidence of retaliation because Kotla had information the Lab "perceived to be very detrimental" and "anything that they [could] do to somehow undermine that testimony would be to their advantage"; (3) evidence that Kotla was an "instigator" of Norman's sexual harassment complaint and of potential future claims "would be a main reason . . . indicative of retaliation . . . would [be] a reason that there would have been a motivation to retaliate"; (4) the manner in which information Kotla provided in the *Norman* lawsuit was turned against her is further potential evidence of retaliation; (5) Odell's statement to Seibel that Kotla was a "hostile witness" at her deposition was "[c]ritically important" and "extraordinary" in indicating "the intent of . . . laboratory counsel who has the role to protect all parties, now creating a separation of who is the bad guy and who is with us and who is not"; (6) Odell's comment during a break in the deposition that "if [Kotla] knows what's good for her, she will keep her mouth shut," was "self-explanatory" as evidence of retaliation; (7) since Kotla's penalty was

---

[2] Kotla's counsel did not ask the trial court on the record to qualify Dr. Finkelman as an expert in any defined subject area. However, the Lab raised no objection to Finkelman's qualifications in the trial court. We therefore assume for purposes of our analysis that Dr. Finkelman was properly qualified as an expert in the fields of human resources management and industrial psychology.

"excessive for the nature of the offense," retaliation would be "a very obvious motive"; (8) a comment by one investigator classifying Kotla's computer misuse as a relatively low-level infraction of Lab policies was an "extremely important" indicator of retaliation in light of her eventual punishment; and (9) the Lab's failure to investigate Kotla's concern about retaliation is an extremely important factor buttressing Dr. Finkelman's opinion that there was "evidence of retaliation in this case."[3]

We find this testimony was inadmissible under Evidence Code section 801. Section 801 limits permissible opinion evidence in pertinent part as follows: "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to a subject that is *sufficiently beyond common experience that the opinion of an expert would assist the trier of fact*; and [¶] (b) Based on matter . . . that is of a type *that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates . . . .*" (Italics added.)

In our view, Dr. Finkelman's testimony satisfied neither requirement of Evidence Code section 801. It improperly invaded the province of the jury to draw conclusions from the evidence and it lacked any reliable foundation in Dr. Finkelman's professional experience and expertise. The trial court implicitly recognized this when it barred Dr. Finkelman from opining in a direct fashion that the Lab had acted out of a retaliatory motive. Unfortunately, by thereafter allowing Dr. Finkelman to testify that certain facts in evidence were "indicators" of retaliation, the court substantially undercut its earlier ruling and abused its discretion. This error was compounded by jury instructions that, in effect, encouraged jurors to give unwarranted weight to Dr. Finkelman's view of the evidence.

Expert opinion should be excluded " 'when "the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness." ' " (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300 [283 Cal.Rptr. 382, 812 P.2d 563], quoting *People v. McDonald* (1984) 37 Cal.3d 351, 367 [208 Cal.Rptr. 236, 690 P.2d 709].) A trial court's decision to admit expert testimony "will not be disturbed on appeal unless a manifest abuse of discretion is shown." (*People v. Kelly* (1976) 17 Cal.3d 24, 39 [130 Cal.Rptr. 144, 549 P.2d 1240].) "However, the discretion to admit or exclude evidence is not unlimited. 'The discretion of a

---

[3] In addition, Kotla's trial counsel asked Dr. Finkelman why he believed Odell's action in reporting the Spectrum files to OIS was evidence of retaliation. Although the Lab successfully moved to strike Dr. Finkelman's response, the jury first heard him testify as follows: "It would be rather extraordinary if there were any motivation other than retaliation . . . in the middle of a totally different matter to decide to do a criminal investigation of something that's on her computers that appears to be rather innocuous."

trial judge *is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown.* [Citation.]' " (*Korsak v. Atlas Hotels, Inc.* (1992) 2 Cal.App.4th 1516, 1523 [3 Cal.Rptr.2d 833].) "[T]he courts have the obligation to contain expert testimony within the area of the professed expertise, and to require adequate foundation for the opinion." (*Ibid.*)

The parties have cited no California case involving the admissibility of testimony like that given by Dr. Finkelman in this case. However, a number of federal circuit and district court cases have discussed similar testimony in the employment context, and most have rejected it. (See *Curtis v. Oklahoma City Public Schools Bd.* (10th Cir. 1998) 147 F.3d 1200, 1219 [jury could determine for itself whether recruitment plan was evidence of retaliation]; *Barfield v. Orange County* (11th Cir. 1990) 911 F.2d 644, 651, fn. 8 [opinion testimony about whether plaintiff was a victim of discrimination would not assist the trier of fact]; *Ward v. Westland Plastics, Inc.* (9th Cir. 1980) 651 F.2d 1266, 1270–1271 [question whether gender was the basis of differential treatment is not so technical as to require the aid of an expert]; *Brink v. Union Carbide Corp.* (S.D.N.Y. 1997) 41 F.Supp.2d 402, 405 [age discrimination claim can be evaluated and understood by jury without assistance of a human resources expert]; *Smith v. Colorado Interstate Gas Co.* (D.Colo. 1992) 794 F.Supp. 1035, 1044 [expert testimony that employer substantially motivated by discriminatory bias improperly circumvents fact finder's decisionmaking process]; *Lipsett v. University of Puerto Rico* (D.P.R. 1990) 740 F.Supp. 921, 925 [opinion testimony as to whether hostile work environment existed usurps the prerogative of the jury as the fact finder]; cf. *Green v. Kinney Shoe Corp.* (D.D.C. 1989) 715 F.Supp. 1122, 1123–1124 [court should exercise special caution in admitting expert testimony on the issue of evaluating an employer's motivations in discrimination cases].)

Kotla cites two employment cases from other jurisdictions upholding the trial court's discretion to admit the testimony of a human resources expert under circumstances comparable to those presented here: *Davis v. Combustion Engineering, Inc.* (6th Cir. 1984) 742 F.2d 916 (*Davis*) and *Texas Dept. of Human Services v. Green* (Tex.App. 1993) 855 S.W.2d 136 (*Green*). We find neither case persuasive.

The trial court in *Davis* had permitted a personnel management expert to testify that, based on his review of plaintiff's employment records, plaintiff's discharge was the result of age discrimination and could not be explained by other factors. (*Davis, supra,* 742 F.2d at p. 918.) The appellate court held that the trial court's action "was not clearly erroneous, given the broad [federal] standards" of whether such opinion testimony would assist the trier of fact.

(*Id.* at p. 919.) Significantly, the jury in *Davis* had been instructed that it could " 'totally disregard' " the expert's opinions if it found them unsound for any reason. (*Id.* at p. 920.) The court considered this an important factor in ameliorating any prejudice from the improper admission of opinion testimony. (*Ibid.*) The jury instructions used in this case, based on BAJI No. 2.40, in no way ameliorated the risk of improper expert opinion and may have actually compounded it.[4]

In *Green*, a Texas appellate panel upheld the admissibility of expert testimony that the defendant's cumulative acts constituted retaliation, but offered little supporting analysis. (*Green, supra,* 855 S.W.2d at pp. 149–150.) The court gave no apparent consideration to the risk that jurors would lend undue weight to such testimony. *Green* is not persuasive authority.[5]

■ We hold that Dr. Finkelman's testimony and opinions about the significance of the evidence did not assist the jury in its factfinding process. Instead, that testimony created an unacceptable risk that the jury paid unwarranted deference to Dr. Finkelman's purported expertise when in reality he was in no better position than they were to evaluate the evidence concerning retaliation. Absent unusual facts, it must be presumed that jurors are capable of deciding a party's motive for themselves without being told by an expert which finding on that issue the evidence supports.

Moreover, in the context of employment litigation, motive must be inferred from a *unique* constellation of facts that are subject to conflicting interpretations. However experienced Dr. Finkelman is in his field, it is extremely unlikely if not impossible that he has previously encountered circumstances duplicating those that gave rise to this litigation. Certainly, no foundation was established at trial that Dr. Finkelman had so frequently observed employers exploiting information about computer misuse uncovered during employee depositions as pretexts for retaliation that he could confidently apply the same explanation to this case.

---

[4] The jury was instructed in pertinent part as follows: "You are not bound by an opinion. Give each opinion the weight you find it deserves. *However, you may not arbitrarily or unreasonably disregard the expert opinion testimony in this case which was uncontradicted. Therefore, unless you find it is not believable, it is conclusive and binding on you.*" (Italics added.)

[5] Kotla also cites *Colgan v. Fisher Scientific Co.* (3rd. Cir. 1991) 935 F.2d 1407, and *Crenshaw v. Bozeman Deaconess Hosp.* (1984) 213 Mont. 488 [693 P.2d 487]. The issue in *Colgan* was whether the plaintiff presented enough evidence to overcome a summary judgment motion, not whether expert opinion testimony that the plaintiff had suffered discrimination was admissible in a jury trial. *Crenshaw* is also distinguishable. The challenged testimony in that case concerned whether the employer had followed proper personnel standards in discharging plaintiff. That issue was directly relevant to one of plaintiff's causes of action in *Crenshaw* and falls well within the professional expertise of a personnel management expert. Neither *Colgan* nor *Crenshaw* is germane to this case.

Nor did Dr. Finkelman testify that there is some general formula, framework, or theory utilized specially by human resources experts, that allows motive to be calculated from any given set of circumstances. In fact, we find no basis in the record for believing that Dr. Finkelman possessed any special expertise for weighing the evidence of motive in a wrongful termination case. That is the jury's function, assisted by the trial court's instructions and the arguments of counsel. Dr. Finkelman's opinions about the evidence in this case did not offer the jury anything "more than the lawyers can offer in argument." (*In re Air Crash Disaster at New Orleans, La.* (5th Cir. 1986) 795 F.2d 1230, 1233.)

■ Accordingly, the trial court erred in permitting Dr. Finkelman to offer opinion testimony about whether certain facts were "indicators" of a retaliatory motive.[6]

### B. *Prejudice*

We find it reasonably probable that a result more favorable to the Lab would have been reached in the absence of the error. (*Seaman's Direct Buying Service, Inc. v. Standard Oil Co.* (1984) 36 Cal.3d 752, 770 [206 Cal.Rptr. 354, 686 P.2d 1158], overruled on another ground in *Freeman & Mills, Inc. v. Belcher Oil Co.* (1995) 11 Cal.4th 85, 87 [44 Cal.Rptr.2d 420, 900 P.2d 669].) This was a close case. Although there was evidence from which retaliation could be inferred, there was also evidence of a plausible nonretaliatory reason for the employer's decision to discharge Kotla. Kotla admitted that she misused a government computer, and admitted returning to the Lab after hours to erase computer files that provided evidence of her misuse. As a government contractor performing highly classified work, the Lab has a heightened need to ensure the loyalty and integrity of its employees. After hearing the evidence for and against plaintiff's retaliation theory, the jury deliberated for seven days before mustering the minimum number of votes required to reach a verdict in her favor.

On this record, it appears likely that Dr. Finkelman's testimony played a decisive role in the jury's verdict. In his closing argument, Kotla's counsel

---

[6] We fashion no general rule here precluding the use of human resources experts in employment cases. We are concerned solely with Dr. Finkelman's testimony that the facts in evidence were indicators of or had a tendency to show retaliation. Expert testimony on predicate issues within the expertise of a human resources expert is clearly permissible. For example, evidence showing (or negating) that an employee's discharge was grossly disproportionate to punishments meted out to similarly situated employees, or that the employer significantly deviated from its ordinary personnel procedures in the aggrieved employee's case, might well be relevant to support (or negate) an inference of retaliation. Opinion testimony on these subjects by a qualified expert on human resources management might well assist the jury in its factfinding.

took the jury point by point through all of the facts that Finkelman deemed to be indicative of retaliation, using demonstrative blow-ups of the key passages. Counsel called the testimony "very powerful" and emphasized that it was the uncontradicted testimony of an expert in the field. The jury instructions given on the weighing of expert testimony encouraged the jury to pay special deference to uncontradicted expert testimony. This further reinforced the potential impact of Dr. Finkelman's improper opinion testimony.[7]

■ On the record before us, we find it reasonably probable that the jury would have reached a verdict more favorable to the Lab had proper limits been placed on Dr. Finkelman's testimony.[8]

## II. Permission Evidence

Over the Lab's objection, Kotla testified that her immediate supervisor had once given her permission to copy two disks for Fornaciari on the Lab computer. Kotla used this evidence to argue that she had permission to do what she was fired for doing, and therefore must have been terminated for reasons other than those offered by the Lab. The Lab argued unsuccessfully that the asserted permission was irrelevant to prove a retaliatory motive unless the managers who participated in the decision to discharge Kotla were aware of the claim and failed to investigate or consider it before discharging her. The Lab pointed out that despite the many opportunities Kotla had to explain or mitigate her apparent violation of company computer policies during the investigation leading to her dismissal, she in fact never asserted that she had permission from her supervisor to perform outside work.[9]

We agree with the Lab's position. Absent a showing that the claimed permission came to the attention of Mr. Seibel or Mr. Perko before the

---

[7] Kotla's appellate counsel pointed out at oral argument that the Lab proposed the wording of this instruction. Although the record is not entirely clear on that point, the source of the language is immaterial. Neither party claims the instruction was erroneous. Its significance is that it is a relevant factor in evaluating whether the trial court's error in admitting Dr. Finkelman's testimony was likely to have influenced the verdict.

[8] The Lab also argues the trial court should have excluded Finkelman's opinions about whether the Lab could have "more appropriately" investigated and disciplined Kotla. The Lab maintains, and we agree, that neither the propriety of the Lab's disciplinary processes nor the wisdom of its decision were in issue. For the guidance of the trial court in any retrial of this case, opinion testimony on these subjects should be carefully monitored and appropriate limiting instructions given. Opinion testimony that the Lab materially deviated from its own standards and practices in Kotla's case is fair game because such evidence would support an inference of retaliation. But evidence that the Lab could have done a better investigation or decided on a fairer punishment supports no such inference, has no other legal relevance in a retaliation case, and poses a risk of prejudice.

[9] Kotla's supervisor testified that he gave her permission to copy two disks for a friend, not to use Lab computers in furtherance of an outside business.

decision was made to dismiss Kotla, it was error to permit evidence of it. The controlling issue in this case was the state of mind of these decision makers. Facts unknown to them are not logically relevant to establishing their state of mind, either directly or by any chain of inference.

The trial court's error in permitting evidence of Kotla's claimed permission compounded the prejudice created by Dr. Finkelman's improper opinion testimony. Kotla's counsel repeatedly reminded the jury of the permission testimony in his closing argument, and the jury asked to have that testimony read back during its deliberations. In view of the length of the deliberations, the closeness of the jury's vote on liability, and the jury's interest in this issue, we cannot discount the possibility that the jury would have reached a different verdict but for the "permission" testimony. ■ In any event, we hold that the cumulative effect of this testimony in combination with Dr. Finkelman's improper opinion testimony was certainly prejudicial.

Accordingly, we reverse the judgment and remand the case to the trial court for a new trial.[10]

### III. EVIDENCE OF COMPARABLE CASES[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is reversed and the case is remanded to the trial court for further proceedings consistent with this opinion.

Stein, Acting P. J., and Swager, J., concurred.

---

[10] Due to this disposition of the case, Kotla's cross-appeal from the trial court's conditional order denying a new trial and the Lab's appeal from the postjudgment order awarding attorney fees are dismissed as moot.

[*]See footnote, *ante*, page 283.