[No. B181839. Second Dist., Div. Three. July 16, 2007.]

PM GROUP, INC., et al., Plaintiffs, Cross-defendants and Appellants, v. ROD STEWART et al., Defendants, Cross-complainants and Appellants.

 

**COUNSEL**

Lewis Brisbois Bisgaard & Smith, Roy G. Weatherup; Law Offices of Dennis Holahan, Dennis Holahan and Michael K. Zweig for Plaintiffs, Cross-defendants and Appellants.

Gibson, Dunn & Crutcher, Jeffrey D. Dintzer and Michael S. Adler for Defendants, Cross-complainants and Appellants Steve Levine and International Creative Management, Inc.

Christensen, Glaser, Fink, Jacobs, Weil & Shapiro, Kerry Garvis Wright, Elizabeth G. Chilton; Miller Barondess and Louis R. Miller for Defendants, Cross-complainants and Appellants Rod Stewart, Stewart Annoyances, Ltd., Annie Challis, Stiefel Entertainment and Barry Tyerman.

**OPINION**

**KLEIN, P. J.—**

### SUMMARY

Plaintiffs in this case are concert promoter Howard Pollack, doing business as PM Group, Inc., and two subpromoters, Achilles Sojo doing business as AKE Music and Richard Leon Velarde doing business as Boulevard CIE. Defendants are singer Rod Stewart, his company Stewart Annoyances, Ltd., his manager Annie Challis of Stiefel Entertainment, his attorney Barry Tyerman of the then Armstrong Hirsch Jackoway Tyerman & Wertheimer (AH), and his agent Steve Levine of International Creative Management (ICM).

Plaintiffs sued for the return of $780,000 deposited toward a concert tour by Stewart that did not materialize and for interference with contract and prospective economic advantage. Stewart cross-complained for $2.1 million, the full amount he would have been paid for the tour.

In a special verdict, the jury found the parties never entered into a binding contract for Stewart's services. The jury awarded plaintiffs $780,000 on theories of money had and received and negligent misrepresentation by Challis and Levine. The jury also found defendants Tyerman and Levine intentionally interfered with subcontracts for concert performances by Stewart, which plaintiffs had entered into with various third parties, resulting in damages of $1.6 million. The jury found in favor of defendants on the cause of action for intentional interference with prospective economic advantage.

We conclude the failure of the parties to enter into a contract for the proposed concert tour precluded performance of the subcontracts. Thus, defendants, as a matter of law, did not interfere with the performance of the subcontracts. Additionally, Stewart and his representatives cannot interfere with subcontracts that contemplate concert performances by Stewart. Accordingly, we reverse the judgment on the cause of action for intentional interference with contract. In all other respects, the judgment is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Initial negotiations.*

In October of 2001, Pollack began negotiations with Stewart's agent, Steve Levine at ICM, for a concert tour of South and Latin America by Stewart. Pollack had partners/subpromoters in each of the cities the proposed tour would visit. On October 19, 2001, one of these subpromotors, plaintiff Achilles Sojo of Argentina, arranged for $100,000 to be deposited into ICM's trust account to demonstrate good faith. Pollack thereafter agreed with Levine and Stewart's manager, Annie Challis, on a nine-city, 18-day concert tour commencing February 20, 2002, for $2.1 million, half of which was due on signing of a formal contract.

2. *Tyerman becomes involved.*

On November 15, 2001, Challis sent Stewart's attorney, Barry Tyerman at AH, an e-mail outlining the terms of the tour and instructing Tyerman to prepare a contract and collect the deposit. Tyerman enclosed the first draft of the contract to Pollack in a letter dated November 20, 2001. The letter directed Pollack to sign and return the contract and arrange for wire transfer of the balance of the first payment, $950,000, to the AH trust account.

The first draft of the contract required Pollack to pay all air fare and cargo, even though Pollack had negotiated a "delivered" deal. The next draft omitted a *force majuere* clause Pollack wanted because of unrest in Argentina. Tyerman mailed the fourth draft of the contract to Pollack on December 20, 2001. It provided the first payment of $1,050,000 was due on January 2, 2002, and the balance was due on February 4, 2002.

While drafts of the contract were being exchanged, the subpromoters made additional deposits toward the first payment. By January 3, 2002, $350,000 had been deposited into the ICM trust account and $180,000 had been deposited into the AH trust account. There was talk of Sojo paying Stewart's $300,000 cargo bill in Argentina, in lieu of $300,000 of the deposit, in order to avoid restrictions on international transfers of money from Argentina.

Tyerman sent e-mails to Pollack on December 28, 2001, and January 4 and 7, 2002, asking for the signed contract and the balance of the first payment. Tyerman threatened to terminate plans for the tour and retain the deposits.

### 3. *Pollack releases funds from the ICM trust account.*

On January 9, 2002, Challis asked Levine to transfer $460,000 that had been deposited into the ICM trust account to the AH trust account. From there it would be transferred to one of Stewart's companies to permit Challis to pay expenses related to the tour. Before Pollack signed the release of the funds, he spoke to Challis and Levine by telephone and specifically asked if they were "setting him up" for a cancellation. Each assured him the tour would go forward and, in fact, he had to release the funds for that to happen.

Pollack discussed the release of the funds with Sojo and, after Pollack signed the release, Sojo commenced ticket sales in Argentina. Sojo testified it is customary to sell tickets after money is released to the artist. After Pollack signed the release, $460,000 was transferred from the ICM trust account to the AH trust account.

### 4. *The negotiations continue and eventually unravel.*

At some point, Pollack changed the due date for the first payment of the deposit in the fourth draft of the contract from January 2 to January 15, 2002, initialed the change and returned the draft to Tyerman. On January 11, 2002, Pollack advised Tyerman by e-mail the promoters had agreed to pay approximately $50,000 for in-ear monitors at the concert venues, thus concluding the last deal point in dispute. A formal contract was never signed. However, witnesses on both sides of the dispute agreed concert tours frequently proceed in the absence of a signed contract and, in some cases, the contract is signed after the tour is completed.

On January 14, 2002, $640,000 was transferred from the AH trust account to Stewart's company.

On January 15, 2002, Challis learned that tickets for the concert in Argentina had gone on sale, even though she had not yet authorized ticket sales and the first payment had not yet been made. Challis, Levine and

Tyerman conferred and decided to cancel the tour. Tyerman wrote Pollack a letter that day informing him of their decision to terminate the contract and retain the deposits.[1]

On January 16, 2002, $100,000 was deposited into the ICM account by Telefonica Italiano Mobile (TIM) for the concert date in Peru. ICM retained this deposit as a credit against fees owed ICM by Stewart. This deposit brought the total amount deposited toward the first payment to $780,000.

On January 18, 2002, Pollack tried to salvage the deal and proposed a 10-city tour for $2.2 million, with an additional $400,000 to be deposited the next day, but the deposit was never made.

By letters dated January 22, 2002, Tyerman advised the six subpromoters who were working with Pollack that "PM Group has no contractual or other relationship with [Stewart], is not authorized to furnish the services or rights of Mr. Stewart or otherwise bind our clients in any way and no concert by our client will be performed."

### 5. *Litigation.*

Plaintiffs sued for return of the $780,000 deposited toward the first payment on counts of unjust enrichment and money had and received. Pollack and PM Group also sought to recover these deposits based on negligent misrepresentation by Challis and Levin. Plaintiffs further alleged intentional and negligent interference with their contracts with the subpromoters and interference with prospective economic advantage based on plaintiffs' loss of the opportunity to promote concert tours by other entertainers with whom they already were in negotiations. Finally, plaintiffs sought punitive damages.

Stewart cross complained for $2.1 million which he claimed was due under the fourth draft of the contract, initialed by Pollack.

---

[1] Tyerman's letter to Pollack dated January 15, 2002, stated Pollack and PM Group were in "material breach" of their obligations to Stewart in that Pollack had:

"1. Failed to execute and return the fully negotiated document confirming the details of the agreement with respect to the concert tour;

"2. Failed to make payment of the agreed upon sum of $1,050,000 due from you to our client on or before January 2, 2002; and

"3. Apparently caused or permitted the public sale of tickets to one or more of the proposed concerts, notwithstanding specific written notice from our clients' agents, acknowledged and agreed to by you, that no such sales for any of the concerts would take place unless and until your various breaches had been cured and you were specifically authorized by our clients to proceed."

Tyerman concluded by indicating Stewart would retain the money already deposited and might seek "payment of the balance of the guaranteed fee . . . ."

### 6. *Postevidentiary motions, verdict and postverdict motions.*

Following presentation of the evidence to the jury, the trial court granted nonsuit on plaintiffs' claim for punitive damages, finding there was insufficient evidence of malice, fraud or oppression.

The matter went to the jury with a 26-question special verdict form. In response to the first question, the jury found Pollack and Stewart never entered into a contract. The jury found in favor of plaintiffs on the claim of money had and received in the amount of $780,000, assigning $280,000, $270,000 and $230,000, to Pollack, Sojo and Velarde, respectively. The jury also found Challis and Levine made negligent misrepresentations to Pollack in connection with the January 9, 2002 release of the funds from the ICM trust account resulting in damages in the amount of $780,000.

On the claim of intentional interference with contract, the jury found Tyerman and Levine knowingly and intentionally disrupted the performance of the six subpromoter contracts involved in the transaction and that, as a result, plaintiffs were damaged in the total amount of $1.6 million, consisting of $350,000 to PM Group (Pollack), $450,000 to AKE Music (Sojo) and $800,000 to Boulevard CIE (Velarde).[2]

The jury found against plaintiffs on their claim of intentional interference with prospective economic advantage and found the manager's privilege did not apply to Tyerman, Challis or Levine.

On the equitable claim of unjust enrichment, the trial court, sitting without a jury, found in favor of plaintiffs in the amount of $780,000. The trial court also found defendants Levine, ICM, Tyerman, AH, Challis and Stiefel Entertainment were agents of Stewart and the agents of each other. Thus, any recovery on the negligent misrepresentation claim would reduce the unjust enrichment and the money had and received claims.

The trial court denied defendants' motions for judgment notwithstanding the verdict and awarded plaintiffs attorney fees in the amount of $472,216 pursuant to Civil Code section 1717 because they prevailed on Stewart's contract-based cross-complaint for $2.1 million.

---

[2] The subcontracts were between: (1) PM Group and AKE Music, (2) PM Group and CIE Brasil, (3) PM Group and Jose Dueno, (4) AKE Music and Rafael Fernandez, (5) AKE Music and Multimusica, and (6) Ricardo Leon Velarde and Grand Entertainment.

## CONTENTIONS

Defendants contend the trial court should have excluded the testimony of plaintiffs' expert and the $1.6 million awarded for intentional interference with contract must be set aside. With respect to the award of $780,000, defendants contend any negligent misrepresentation related to the written release of the funds was harmless, plaintiffs lacked standing to recover any money deposited by entities who were not plaintiffs, and no misrepresentations were made to Pollack. Finally, defendants contend the award of attorney fees must be reversed because plaintiffs recovered in quasi-contract.

On cross-appeal, plaintiffs contend the trial court erred in not allowing the jury to decide their claim for punitive damages.

## DISCUSSION

### 1. *Admissibility of the testimony of plaintiffs' expert.*

#### a. *Defendants' contention.*

Defendants contend the trial court erroneously permitted Owen J. Sloane, an entertainment attorney practicing since 1968, to testify the parties did not reach a binding agreement in that there was no meeting of the minds. Defendants argue such expert opinion testimony is inadmissible to determine the intentions of contracting parties (*Transport Indem. Co. v. American Fid. & Cas. Co.* (1970) 4 Cal.App.3d 950, 960 [84 Cal.Rptr. 856]) or to explain matters of common knowledge (*Kotla v. Regents of University of California* (2004) 115 Cal.App.4th 283, 293–295 [8 Cal.Rptr.3d 898]). They claim Sloane also improperly defined legal terms such as "meeting of the minds" and "guaranteed compensation" (see *Summers v. A. L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1182–1183 [82 Cal.Rptr.2d 162]) and he improperly testified the contract drafts contained no provision barring ticket sales without Stewart's prior written approval, the deposited money did not belong to Stewart, the liquidated damages clause was not a fair and reasonable forfeiture (*Beasley v. Wells Fargo Bank* (1991) 235 Cal.App.3d 1383, 1393 [1 Cal.Rptr.2d 446] [the validity of liquidated damages clause is a question of law]), and the three grounds identified by Tyerman in the cancellation letter of January 15, 2002 were not legally valid grounds upon which to claim breach of contract. Defendants claim Sloane even testified Pollack was credible while Levine, Challis and Tyerman were biased in Stewart's favor.

Defendants conclude Sloane, like the expert witness in *Summers*, "made plaintiffs' closing argument from the witness stand." (*Summers v. A. L. Gilbert Co.*, *supra*, 69 Cal.App.4th at p. 1185.) Thus, the result of the trial would have been more favorable to defendants had Sloane's improper testimony been excluded.

> b. *Defendants failed to object to much of the testimony they claim was inadmissible.*

Defendants claim they have preserved this issue for appeal by making a motion in limine which was denied and by objecting at trial to similar testimony by Sloane. Thus, any further objection would have been futile. (*City of Long Beach v. Farmers & Merchants Bank* (2000) 81 Cal.App.4th 780, 784–785 [97 Cal.Rptr.2d 140].)

However, the trial court sustained at least one of defendants' objections to Sloane's testimony. Specifically, when plaintiffs' counsel asked if Sloane had an opinion as to whether the parties expressed their intention that there be a signed agreement in order for there to be a binding contract, the trial court sustained an objection interposed by defendants that the answer would invade the province of the jury. Given that the trial court sustained at least one objection to Sloane's opinion testimony, it cannot be said that further objection by defendants would have been futile. However, even if defendants' failure to object in the trial court is overlooked, the claim fails on the merits.

> c. *Sloane's testimony properly admitted.*

Generally, the opinion of an expert is admissible when it is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact . . . ." (Evid. Code, § 801, subd. (a); see *Summers v. A. L. Gilbert Co.*, *supra*, 69 Cal.App.4th at p. 1184.) Also, "[t]estimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." (Evid. Code, § 805.) However, " 'Where the jury is just as competent as the expert to consider and weigh the evidence and draw the necessary conclusions, then the need for expert testimony evaporates.' [Citation.]" (*People v. Torres* (1995) 33 Cal.App.4th 37, 47 [39 Cal.Rptr.2d 103]; see *Summers v. A. L. Gilbert Co.*, *supra*, at p. 1183.)

The record reveals Sloane's testimony related primarily to the customs and practices of the entertainment industry, specifically, the music concert business. Because these customs and practices are sufficiently beyond common experience, Sloane's expert opinion was admissible to assist the trier of fact. (*Marx & Co., Inc. v. The Diners' Club, Inc.* (2d Cir. 1977) 550 F.2d 505,

508–509 [securities business]; *Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 924 [148 Cal.Rptr. 389, 582 P.2d 980] [attorney properly could opine whether an insurance company acted in bad faith]; Evid. Code, § 801.)

 d. *Any error in the admission of Sloane's testimony was harmless.*

Even if some of the opinions expressed by Sloane invaded the province of the jury, the error does not require reversal. The opinions expressed by Sloane were exactly the opposite of the opinions expressed by defendants' expert, Tyerman, who had been Stewart's attorney for 20 years and who testified both as a percipient witness and an expert.

Defendants argue Tyerman's rebuttal testimony cannot be used to show the error was harmless because, at the time of this testimony, Tyerman was being examined by *plaintiffs'* counsel after Sloane already had testified improperly there was no contract. Defendants assert they were entitled to rebut Sloane's testimony without waiving the claim of evidentiary error. (*Hoel v. City of Los Angeles* (1955) 136 Cal.App.2d 295, 310–311 [288 P.2d 989] [an attorney who submits to the authority of an erroneous adverse ruling, after making appropriate objections, does not waive the error in the ruling by introducing responsive evidence to offset or explain the erroneously admitted evidence so far as possible].)

However, other defense witnesses with credentials similar to Tyerman's in the entertainment industry testified Stewart entered into a binding contract with Pollack. For example, Levine, Stewart's agent, testified they had a deal after Stewart's appearance was confirmed. Challis, Stewart's manager, testified she thought they had a confirmed deal. Finally, Stewart himself appeared as a witness at trial and testified "a deal is a deal."

We are confident the admission of the opinion of a single expert on plaintiffs' side to oppose the repeatedly expressed contrary opinion on defendants' side does not require reversal. Because exclusion of Sloane's testimony with respect to whether the parties reached a meeting of the minds would not have altered the result of the trial, any error must be seen as harmless. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 573–574 [34 Cal.Rptr.2d 607, 882 P.2d 298]; *Finney v. Gomez* (2003) 111 Cal.App.4th 527, 550 [3 Cal.Rptr.3d 604]; Cal. Const., art. VI, § 13.)

 2. *The judgment on the count of intentional interference with contract must be reversed.*

The jury found defendants interfered with subcontracts among: (1) PM Group and AKE Music; (2) PM Group and CIE Brasil; (3) PM Group and

Jose Dueno; (4) AKE Music and Rafael Fernandez; (5) AKE Music and Multimusica; and (6) Velarde and Grand Entertainment. Each of these subcontracts contemplated a concert performance by Stewart at one or more of the venues on the proposed tour.

■ However, as a matter of law, Stewart and his agents could not have interfered with the performance of these subcontracts. The tort of intentional interference with contractual relations is committed only by "strangers— interlopers who have no legitimate interest in the scope or course of the contract's performance." (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 514 [28 Cal.Rptr.2d 475, 869 P.2d 454].) Consequently, a contracting party is incapable of interfering with the performance of his or her own contract and cannot be held liable in tort for conspiracy to interfere with his or her own contract. (*Ibid.*; *Weinbaum v. Goldfarb, Whitman & Cohen* (1996) 46 Cal.App.4th 1310, 1316–1317 [54 Cal.Rptr.2d 462].) Because the subcontracts at issue here provided for Stewart's performance, neither Stewart nor his agents can be liable for the tort of interfering with the subcontracts.

■ Additionally, the jury concluded Stewart and PM Group never entered into a binding contract for Stewart's performance. Thus, none of the subcontracts among plaintiffs and the subpromoters could have been performed. Accordingly, defendants cannot be said to have caused the failure of the subcontracts and therefore cannot be liable for intentional interference with contract. (*Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 391 [10 Cal.Rptr.3d 429] [interference with contractual relations requires proof the defendant's conduct was a substantial factor in bringing about an injury, damage, loss or harm]; *Service by Medallion, Inc. v. Clorox Co.* (1996) 44 Cal.App.4th 1807, 1818 [52 Cal.Rptr.2d 650].)

For both of the foregoing reasons, the cause of action for intentional interference with contract fails.

> 3. *The damages awarded by the jury on the count of money had and received and by the trial court on the count of unjust enrichment need not be reduced.*

Defendants contend the damages for money had and received must be reduced because only $100,000 of the $780,000 deposited belonged to plaintiffs. Defendants note Velarde deposited $70,000 and Sojo deposited $30,000 and the rest of the deposits came from entities who were not parties to the lawsuit. Thus, plaintiffs lack standing to recover more than $100,000. (Code Civ. Proc., § 367.) Defendants argue that allowing plaintiffs to recover deposits made by third parties on a theory of money had and received creates

the possibility of multiple lawsuits seeking duplicative recoveries against the same defendant. (*Keru Investments, Inc. v. Cube Co.* (1998) 63 Cal.App.4th 1412, 1424 [74 Cal.Rptr.2d 744].) Defendants conclude the judgment on the count for money had and received should be reduced to $100,000.

On a similar theory, defendants claim the trial court's ruling on the unjust enrichment claim must be reduced to $100,000, the value of the benefit plaintiffs themselves conferred on defendants. Defendants also argue the money deposited by entities who were not plaintiffs was for the use and benefit of Stewart as it was paid toward the guaranteed compensation he was to receive for the concert tour. (*First Nationwide Savings v. Perry* (1992) 11 Cal.App.4th 1657, 1662 [15 Cal.Rptr.2d 173].) Thus, the claim of unjust enrichment fails.

We do not find these arguments persuasive. The evidence showed plaintiffs either personally made or orchestrated the deposits pursuant to what amounted to a joint venture among plaintiffs, the subpromoters and the entities that deposited money to secure Stewart's performance at the various venues. The jury and the trial court reasonably could conclude plaintiffs were entitled to demand the return of the money deposited on behalf of the entities each plaintiff brought to the venture. Indeed, given the unusual circumstances presented, no danger of multiple lawsuits seeking duplicative recoveries appears.

Moreover, defendants obtained reversal of the $1.6 million awarded for intentional interference with contract, essentially, because the facts underlying this dispute showed a single, interrelated negotiation among plaintiffs, the subpromoters and the entities that deposited money for concert performances by Stewart. Thus, defendants could not, as a matter of law, interfere with the subcontracts for Stewart's performance. It would be inequitable to permit defendants now to splinter the joint venture into its constituent parts in order to avoid the negligent misrepresentation award. Accordingly, these claims fail.

4. *Sufficiency of the evidence to support the cause of action for negligent misrepresentation.*

 a. *The negligent misrepresentations.*

ICM and Levine (Levine) contend the judgment on the claim of negligent misrepresentation must be reversed because the evidence demonstrates

Levine made no misrepresentation to PM Group.[3] Levine notes both he and Pollack testified Levine did not represent that the tour would go forward if Pollack signed the release and also said PM Group needed to pay the full deposit. Levine argues this testimony contrasts with Pollack's testimony that Challis "assured me that they weren't canceling. She assured me that they were in . . . too deep." Levine concludes that because the evidence does not demonstrate a misrepresentation on his part, the cause of action for negligent misrepresentation must fail. (*Goehring v. Chapman University* (2004) 121 Cal.App.4th 353, 364 [17 Cal.Rptr.3d 39].)

However, as the trial court observed in its posttrial rulings, each defendant was the agent of Stewart and the agent of each other. This being the case, Challis and Levine were agents of Stewart and agents of each other. Based on Pollack's testimony that each denied they were "setting him up" for a cancellation before Pollack signed the release, the jury reasonably could conclude Challis and Levine each had sufficient involvement in the negligent misrepresentation to warrant imposition of liability. Consequently, this contention amounts to little more than a request to reweigh the evidence on appeal.

### b. *The evidence adequately demonstrates causation.*

Defendants contend any misrepresentation by Challis or Levine was harmless in that, even if Pollack had not signed the release, the $460,000 in ICM's client trust account on January 9, 2002, would not have been returned to plaintiffs. Rather, the funds would have been treated the same as the $130,000 that remained in the ICM client trust account and the $180,000 that went directly to the AH trust account. Because release of the funds had no impact on plaintiffs' damages, there was no harm caused by any misrepresentation. (*Goehring v. Chapman University, supra,* 121 Cal.App.4th at p. 364; *Service by Medallion, Inc. v. Clorox Co., supra,* 44 Cal.App.4th at p. 1818 [tort recovery requires proof of " 'detriment proximately caused' " by the defendant's tortious conduct].)

Defendants next urge there is no proximate causation with respect to the $30,000 deposited by Grand Entertainment Group on January 9, or the $100,000 deposited by TIM on January 16, 2002, because those Peruvian entities were unaware of any misrepresentation made to Pollack in connection with the release. Thus, these entities could not have relied thereon. Defendants assert that, because plaintiffs failed to demonstrate a link between the alleged misrepresentations to Pollack on January 9 and any reliance on those

---

[3] Challis and Stiefel join in ICM's brief on this point and the causation argument that follows.

statements by either Grand Entertainment Group or TIM, there was no evidence the alleged misrepresentation played any part in the deposit of these additional funds. (*Cadlo v. Owens-Illinois, Inc.* (2004) 125 Cal.App.4th 513, 520 [23 Cal.Rptr.3d 1].) Defendants conclude Pollack and PM group, the only plaintiffs on the negligent misrepresentation claim, failed to show they were damaged and, because none of the $130,000 came from PM group or Pollack, they did not suffer damages. (*Weinbaum v. Goldfarb, Whitman & Cohen, supra*, 46 Cal.App.4th at p. 1315, fn. 6.)

We disagree with defendants' view of the case. It appears the jury found the written release extracted from Pollack by defendants acting in concert caused a fundamental change in the bargaining positions of the parties and thus had an impact on the deal in its entirety, including all the funds deposited in anticipation of the concert tour. Consequently, the attack on the sufficiency of the evidence to demonstrate causation fails.

### 5. Attorney fees.

The trial court awarded plaintiffs attorney fees in the amount of $472,216 pursuant to Civil Code section 1717. The trial court noted the issue whether a contract had been formed was pervasive in this case and plaintiffs themselves reduced their request for fees by 10 percent to reflect time attributable to the noncontractual causes of action.

Defendants argue plaintiffs' recovery on tort claims, quasi-contract and common counts such as money had and received precludes recovery under Civil Code section 1717. (*Childers v. Edwards* (1996) 48 Cal.App.4th 1544, 1548 [56 Cal.Rptr.2d 328].)

Alternatively, defendants argue plaintiffs prevailed in this case because they proved the absence of a contract. Thus, the trial court should have applied considerations of equity in determining whether plaintiffs prevailed on the contract. (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 876 [39 Cal.Rptr.2d 824, 891 P.2d 804].)

These claims fail because the trial court properly could conclude plaintiffs prevailed on defendants' contract claim by establishing the nonexistence of the purported contract. Accordingly, they were entitled to attorney fees under Civil Code section 1717. (*Scott Co. v. Blount, Inc.* (1999) 20 Cal.4th 1103, 1109 [86 Cal.Rptr.2d 614, 979 P.2d 974]; *Erickson v. R.E.M. Concepts, Inc.* (2005) 126 Cal.App.4th 1073, 1083–1084 [25 Cal.Rptr.3d 39].) The trial court reasonably could find the contractual claims and the tort claims were " ' "inextricably intertwined" ' [citation], making it 'impracticable, if not impossible, to separate the multitude of conjoined activities into compensable

or noncompensable time units.' " (*Abdallah v. United Savings Bank* (1996) 43 Cal.App.4th 1101, 1111 [51 Cal.Rptr.2d 286].)

Because plaintiffs' tort theories and Stewart's contract based cross-complaint were interrelated and required presentation of virtually identical evidence, the trial court properly could conclude a 10 percent reduction in the total amount of attorney fees was adequate to reduce the fee award to that amount attributable to the defense of the contract claim. (*Erickson v. R.E.M. Concepts, Inc., supra*, 126 Cal.App.4th at pp. 1085–1086; *Abdallah v. United Savings Bank, supra*, 43 Cal.App.4th at p. 1111.)

We therefore conclude defendants have failed to demonstrate error in the award of attorney fees. (*Sessions Payroll Management, Inc. v. Noble Construction Co.* (2000) 84 Cal.App.4th 671, 677 [101 Cal.Rptr.2d 127].)

 6. *Punitive damages.*

Plaintiffs contend the trial court erroneously granted defendants' motion for nonsuit with respect to their claim for punitive damages. Plaintiffs concede punitive damages are not available in actions arising out of contract, including interference with contract. (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd., supra*, 7 Cal.4th at p. 516.) However, plaintiffs assert negligent misrepresentation is a form of deceit (*Fox v. Pollack* (1986) 181 Cal.App.3d 954, 962 [226 Cal.Rptr. 532]) and the evidence here showed defendants were guilty of oppression, fraud and malice by concealing their intention to terminate the concert tour, making false assurances to Pollack and by retaining the deposits, even though the standard practice in the industry suggested defendants had no right to the deposited funds. (Civ. Code, § 3294, subd. (a).) Plaintiffs conclude that because defendants thus acted with malice in attempting to retain the deposits without a valid contract, the issue of punitive damages should have gone to the jury. Plaintiffs request a remand for the limited purpose of retrial on the issue of punitive damages.

█ However, it is well settled that punitive damages are not recoverable for negligent misrepresentation. (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1241 [44 Cal.Rptr.2d 352, 900 P.2d 601]; *Wyatt v. Union Mortgage Co.* (1979) 24 Cal.3d 773, 790 [157 Cal.Rptr. 392, 598 P.2d 45]; *Branch v. Homefed Bank* (1992) 6 Cal.App.4th 793, 799 [8 Cal.Rptr.2d 182] [no punitive damages recoverable for negligent misrepresentation].) Consequently, the trial court properly granted nonsuit on plaintiffs claim for punitive damages.

## DISPOSITION

The judgment in favor of plaintiffs on the cause of action for intentional interference with contract is reversed. In all other respects, the judgment is affirmed.

Plaintiffs are awarded costs on appeal.

Croskey, J., and Aldrich, J., concurred.