Filed 5/24/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| RAFI A. KOUROUNIAN, | B309007 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LC102903) |
| v. | |
| CALIFORNIA DEPARTMENT OF TAX AND FEE ADMINISTRATION, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael J. Convey, Judge. Reversed.

Rob Bonta, Attorney General, Chris A. Knudsen, Assistant Attorney General, Gabrielle H. Brumbach and Victoria Jalili, Deputy Attorneys General, for Defendant and Appellant.

Donna Bader; Mooradian Law, Zorik Mooradian, Andrina Hanson, and Nanor C. Kamberian for Plaintiff and Respondent.

———————————

Rafi Kourounian obtained a $425,562 jury verdict in his favor on his claim that the California Department of Tax and Fee Administration (the Department) retaliated against him for filing an internal complaint with its Equal Opportunity Office (EEO). The Department appeals, contending that four erroneous evidentiary rulings by the trial court deprived it of a fair trial. Specifically, appellant contends the trial court erred in (1) admitting evidence of allegedly retaliatory conduct which pre-dated the filing of his internal complaint, (2) admitting into evidence Kourounian's EEO complaints, (3) permitting Kourounian to offer testimony that exceeded the scope of rebuttal, and (4) permitting Kourounian to offer evidence of 10 failed promotional attempts. Appellant also contends the evidence supporting economic damages is speculative. We agree the trial court erred in admitting evidence about activity that occurred before the filing of his EEO complaints. We also agree admission of the first EEO complaint and supplement was prejudicial and prevented the Department from receiving a fair trial. Accordingly, we reverse the judgment and remand for further proceedings. We need not and do not reach the Department's other claims of error.

## BACKGROUND

A.    *Kourounian's Case*

Appellant, then known as the California State Board of Equalization, hired Kourounian as a tax auditor in 1989. He was promoted to "senior tax auditor" in 2001. On or about April 5, 2012, Kourounian was promoted to business tax specialist 1 (BTS1). Promotion to this position included a one-year probationary period.

2

Several witnesses testified that Kourounian's performance prior to his 2012 promotion was very good. Gregory McNamee, Kourounian's supervisor from 2002 to 2011, testified Kourounian was one of the "top-producing auditors" and his audits were "quite good." McNamee never had any problems with Kourounian's analytical skills. Mareta Ter-Galstian and Becka Jun, who supervised Kourounian consecutively in 2011 and 2012, gave similarly positive testimony. Ter-Galstian described Kourounian as independent, able to handle complex audits, knowledgeable, and competent. Jun described Kourounian as independent, able to handle complex audits, capable of handling BTS1 level audits, and knowledgeable.

In September 2012, while Kourounian was serving as a probationary BTS1, Warren Klomp and Doris Chiang told Kourounian he was selected to be appointed as a limited term supervisor because the person who held the supervisory position was going on maternity leave. Klomp was the office administrator and Chiang was the district principal auditor. Kourounian agreed.

In mid-October 2012, Klomp gave Kourounian a taxpayer's complaint and asked him to investigate it. The complaint alleged that co-worker Silva Saghbazarian had discriminated against a taxpayer due to his age. Kourounian investigated and made findings of discriminatory conduct by Saghbazarian and criticized the chain of command for not following required procedures. Chiang was in the chain of command. He reported his findings to Klomp and Chiang. He formed the impression they were angry at him.

On January 22, 2013, Kourounian's limited term supervisorial position ended.  He returned to his BTS1 position.  He was placed under Saghbazarian's direct supervision.  Saghbazarian's supervisor was Chiang, the district principal auditor.  He was now under supervision by the two persons he had criticized in his investigative report.

At trial, Kourounian testified to problems he had with Saghbazarian.  She removed audits from him after he had begun working on them, which had never happened to him before.  She called or emailed him during the first sessions of audits and told him to return to the office, but nothing happened when he returned to the office.  On one occasion she made him come to the office at 7:15 a.m. for a meeting, kept him waiting about four hours and then told him they would meet another time instead.  Saghbazarian tasked Kourounian with training another auditor, Vivian Nguyen; Kourounian learned of the task when Nguyen showed up at a location where Kourounian was conducting an audit.  Kourounian was required to take Nguyen with him wherever he went for the next six weeks.  Kourounian testified he "understood that she was sent to spy on me."  Unlike his previous supervisors, Saghbazarian rarely if ever called Kourounian on his work cell phone.  Instead she called him on the taxpayer's landline.  Kourounian viewed this as checking up on him.  Whenever Saghbazarian sent him an email, she always copied her superiors.  None of his previous supervisors had done this as a routine practice.  Saghbazarian sent him a memo telling him he needed to reduce his excess vacation hours.  Kourounian did not believe that anyone else with excess hours had been asked to reduce their hours.

In March 2013, Kourounian filed an EEO complaint, which he amended with an April 24, 2013 supplement (March/April EEO complaint). The complaint alleged that Saghbazarian was discriminating against him on the basis of age and race or national origin and she was retaliating against him because of his findings in the taxpayer complaint investigation. The trial court admitted this document into evidence.

The 13-page complaint included many statements about which Kourounian testified at trial, but it also set out additional allegations about Saghbazarian's conduct. Kourounian wrote: "There was a general impression in the office that [Saghbazarian] can't stand me and I need to be careful about it." "On 2/24/2013, [Saghbazarian] had a meeting with me where she told me that it is not likely that she will let me pass the probation for my BTS I position. In any case, she insisted she will watch me carefully and make life difficult for me." "[Nguyen] ended up confessing to me that her real task was . . . to spy on me and report regularly to [Saghbazarian]." "Silva Saghbazarian apparently in an obsessive manner has talked about me and repeatedly characterized me as 'dishonest.' . . . This is a slander." On days after field work with a particular accountant, Kourounian "started getting worrisome phone calls from the . . . accountant, telling me that on the days when I am not there, my supervisor was making insistent and time consuming phone calls to him demanding to know whether there was anything irregular in what I was doing." Saghbazarian came to a business Kourounian was auditing and "ma[de] a number of personal comments." These comments related largely to Kourounian's personal wealth. There "seems to be an obsession on the part of [Saghbazarian] with my vacation time." Saghbazarian made mobile working

difficult for Kourounian but not for other BTS1s.  Kourounian was not permitted to do field observations.  Another auditor "was repeatedly told that she can have anybody she wants [accompany her on night observations] except me."  Saghbazarian overreacted to Kourounian arriving at a business a few minutes late and wrote a "very nasty memo" which showed she was targeting him.  Saghbazarian had a "personal obsession" with Kourounian.   In two meetings, the "tone of [Saghbazarian's] conversation was consistently humiliating and [there] were always put downs."

On May 13, 2013, as a result of the March/April EEO complaint, Kourounian was assigned to report to a new supervisor, Chiang.  Kourounian testified that on his first work day with Chiang, she came up to Kourounian in front of others and "started shouting and saying that the reason you are in this situation is because of the complaint you filed, and you're going to be told and I'm going to get you."  Kourounian testified about many other actions which Chiang took thereafter, but he seldom provided dates for them.  Chiang was his direct supervisor for only a few months, until August or September.

Chiang eliminated Kourounian's field audits and required him to stay in the office.  He was not allowed to work as part of a crew.  He was the only auditor not assigned to a crew.  After two or three months he was permitted to resume field audits because there was no other work for him to do.

Kourounian was not permitted to do public speaking on behalf of the Department after May 2013, although he had done so previously.

Chiang denied Kourounian mobile working privileges.  He was the only one so denied.  Chiang required Kourounian to email her a report in the morning detailing what he was going to work on that day and a second email in the evening detailing what he had done that day.  Chiang did not ever reply to these emails.  He was required to do this every day.  Kourounian had never had such a requirement before and, as far as he knew, no other auditor had had such a requirement.

Klomp and Chiang came by Kourounian's cubicle every day but did not acknowledge him.  On one occasion, Klomp threw him out of a supervisor's office.

While this was going on, Kourounian filed a second EEO complaint on May 23, 2013 (May EEO complaint), alleging retaliation for filing the March/April EEO complaint.  This complaint was also admitted into evidence.

The May EEO complaint is very short, and covers events from May 15 through May 17, 2013, involves only three incidents, and focuses on Chiang.  We detail only the specific statements in the complaint which the Department contends prejudiced it.  Klomp told Kourounian a "supervisor is management and she can waste her time but [Kourounian is] not entitled to it."  Chiang told two senior tax auditors, John Kilafian and Zhanna Balagula, that they could take long lunch breaks but Kourounian could not and they needed to check on him.  Chiang also told them Kourounian was "a bad influence and . . . it is advisable . . . to stay away from [him]."  "It was felt by both of them that this is a personal vendetta and an obsession" on Chiang's part."  Chiang gave Kourounian a copy of his probationary report.

Balagula testified she had participated in restaurant observations with Kourounian in the past, but in 2013

7

Saghbazarian told her she could do observations with anyone except Kourounian. Balagula provided details of the lunch reprimand in the May EEO complaint. When she, Kourounian, Artin Avenes, and Kilafian were coming back to the office from lunch, Chiang was waiting by the door and started screaming at them, asking what time they left for lunch and how long they had been gone. It was very loud; the whole office could hear. Chiang told Balagula, Avenes, and Kilafian not to be scared as they were not in trouble. Only Kourounian was in trouble. She told only Balagula, Avenes, and Kilafian to come into her office. Chiang told Balagula she was not in trouble, only Kourounian was in trouble and to "stay away from him, he is [a] bad influence."

In August or September 2013, while still on probation for the promotion, Kourounian was formally rejected for the BTS1 position and he returned to his previous position. In September 2013, Ter-Galstian was assigned to supervise him again.

Ter-Galstian testified that when Kourounian was assigned back to her, Chiang told Ter-Galstian to keep an eye on Kourounian and to have him report to her twice daily. Ter-Galstian had never before been asked to require this of an auditor. Chiang told Ter-Galstian to tell Kourounian to cap his vacation hours. Ter-Galstian had never done so for anyone else she supervised.

Ter-Galstian supervised Kourounian until November 2013. Jun then began supervising Kourounian again and continued to supervise him until the time of trial.

Kourounian administratively appealed the decision to rescind his promotion to BTS1. On November 5, 2013, at a prehearing settlement conference, the parties entered into a settlement agreement. This agreement provided: "2. Respondent

8

agrees to and hereby does withdraw the [Notice of Rejection Pending Probation (NRPP)], and further agrees to remove the NRPP and all supporting documents from [Kourounian's official personnel file]. [¶] 3. Appellant agrees to and hereby does return to his previous position as an Associate Tax Auditor with Respondent for personal reasons effective the close of business on August 21, 2013. . . . [¶] 4. In exchange for such consideration as is set forth in this Stipulation, Appellant releases, acquits, and forever discharges the State of California, the California Board of Equalization, and its agents, representatives, employees, successors and assigns, of and from any and all demands, actions, causes of action, claims of any kind or nature whatsoever, known and unknown, anticipated or unanticipated, past or present, and any claim under state or federal law including, but not limited to, claims under the Fair Employment and Housing Act [(FEHA)] and Title VII of the 1964 Civil Rights Act, which may exist as of the date hereof in connection with or arising out of the actions taken by Respondent [the Board] regarding this NRPP. However, this release does not prevent [Kourounian] from pursuing all available legal remedies concerning his claims for retaliation filed with Respondent's Equal Employment Opportunity (EEO) Office on or about March 2013 and supplemental claim filed in May 2013. Appellant acknowledge[s] that all claims of discrimination associated with his claims to Respondent's EEO Office are waived."

When Kourounian was assigned back to Jun, Chiang and Klomp told Jun to keep an eye on him. According to Jun, Chiang, Saghbazarian, and Klomp would not acknowledge Kourounian if they passed him in the office. On one occasion, Kourounian was talking to Jun in her office when Klomp entered and very

9

abruptly told Kourounian to leave and go back to work.  Klomp then left the office himself.  Jun described Klomp's tone as rude and the encounter as awkward.

Balagula testified that as recently as a year before trial, Saghbazarian was still ignoring Kourounian completely.  Balagula described an incident where she, Kourounian, and Kilafian were walking down the hall and Saghbazarian stopped, gave Kilafian a "high five," and ignored Kourounian.

Jun was aware that Klomp had not included Kourounian in any of Klomp's special projects such as the point of sale program; this made Kourounian an exception in the office.  There was a perception in the office that working on these projects made it more likely that a person would be promoted.  In the four years preceding the trial, everyone in Jun's crew except a BTS1 worked on the point of sale program.

In Jun's opinion, Kourounian was targeted by Klomp in the office.  Jun asked Klomp to include Kourounian in a point of sale project, but got no reply.  When Kourounian first came to Jun's crew, she got the impression from management that she should not raise Kourounian's name.  When his name did come up, it was just ignored.  So, it was easier for Jun not to mention him.

When Jun asked Klomp for permission to allow Kourounian to do mobile work in 2013 through 2016, he replied no.  Other staff members were approved.  Beginning around 2018, Klomp just stopped responding, so Jun decided to allow Kourounian to do mobile work.

When asked if Kourounian was treated like other employees in the office, Jun replied that in certain situations he was not.  Jun believed management would try to find fault with

Kourounian, and if they found any little fault, they would make it into a much bigger deal than it was.

Saghbazarian told Jun, without explanation, that Saghbazarian did not want Kourounian to be given any restaurant audits. This was a large chunk of Jun's crew's work, and auditors with less experience than Kourounian were working on these audits.

Jun had never required an auditor to report to her twice daily and she did not know of any supervisor who had such a requirement.

On May 17, 2014, Kourounian filed a complaint alleging retaliation with the California Department of Fair Employment and Housing (DFEH). He received a right to sue letter. This action followed.

While much of Jun's testimony concerns retaliatory action continuing after this lawsuit was filed, Ter-Galstian provided a significant piece of additional evidence. Ter-Galstian had served on promotion boards considering candidates for promotion to BTS1. In her opinion, Kourounian was fully qualified for a BTS1 position. About a year before trial, there was an opening in Ter-Galstian's crew for a BTS1 and it would have been customary for Ter-Galstian as the supervisor to be on the panel. Instead, Ter-Galstian was removed from the panel. According to Ter-Galstian, there were currently two open BTS1 positions in her office which had been open for months. This was very rare.

B.    *The Department's Case*

In its defense, the Department offered explanations for the actions Kourounian alleged were retaliatory. The Department presented evidence that Kourounian was competent, but as far as

11

back as 2011 he made errors in his work and did not provide enough detail in his audits. Klomp testified he had advised Kourounian in 2011 to "more thoroughly document and detail his work" if he wanted to be promoted.

Saghbazarian testified she criticized Kourounian's work as a BTS1 because it was deficient. She too claimed he needed to provide more documentation and detail in his work.

Saghbazarian stated that headquarters had asked all managers to create a plan to reduce the accumulated vacation hours of employees who had more than 640 hours (Kourounian had excessive hours accumulated, possibly as many as 1,200 hours). In addition to Kourounian, Klomp had been asked to reduce his accumulated hours.

Saghbazarian denied sending Nguyen to spy on Kourounian. She claimed the cases she took from Kourounian were cases he had improperly assigned himself when he was a limited term supervisor.

In May 2013, Saghbazarian stopped supervising Kourounian because he had requested she do so in the EEO complaint. She was informed not to communicate with him thereafter and so she did not. She claimed it was Kourounian who was ignoring her. She stated when he sees her, he turns and walks the other way.

Chiang retired in September 2014. She had a medical event at some point before trial and was declared an unavailable witness. Portions of her deposition were read to the jury. Chiang admitted being upset when Kourounian returned from lunch with other auditors. She claimed she needed to talk to him about

something, but he had not been at his desk.  He had not requested a different lunch period, so she expected him to return to the office at 12:30 p.m. and became upset when he did not. She admitted telling Balagula to stay away from Kourounian because he did not have her best interests at heart and she should not hang out with people like that.

Chiang agreed she restricted Kourounian from doing field observations but said it was because he was a BTS1 at the time and BTS1 staff did not do observations.  She also denied him field visits because he was working on escrow cases which did not require visits.  Chiang stated she had required auditors other than Kourounian to report to her twice a day, although Kourounian was her only supervisee at this point in her career.

Klomp testified Kourounian had not been denied speaking opportunities.  He stated the office received only a few requests for speaking engagements and they were handled by a public information officer.  Klomp stated he never denied Kourounian the chance to work on an audit with a point of sale system.

C.    *Pre-Trial Proceedings*

In 2015, Kourounian filed this action and by the time of trial in 2019, the operative complaint was the Second Amended Complaint (SAC), filed January 2016.  The SAC alleges a single cause of action for retaliation prohibited by statute.[1]  The relief

---

[1]    The copy of the SAC in the record on appeal also alleges a cause of action for declaratory relief and a cause of action for equitable relief.  The trial court sustained a demurrer to the equitable relief cause of action and Kourounian withdrew the declaratory relief cause of action.

13

sought in the SAC is limited by the trial court's ruling on demurrer. As relevant to issues on this appeal, the trial court (not the same judge who presided at trial) ruled that "reporting Saghbazarian's discrimination against an elderly tax payer is not conduct protected by [FEHA]" and so Kourounian "alleges no valid retaliation claim against Ms. Saghbazarian under FEHA for reporting her discrimination against a taxpayer."

With respect to the stipulated settlement agreement over the rescinded promotion, the court found Kourounian "cannot assert his demotion because he waived his right to do so in the stipulation." The court also found that Kourounian, who still worked for the Department, "has alleged public humiliation by Ms. Chiang . . . . The plaintiff has pled sufficient adverse employment actions."

Finally, the court made clear that plaintiff's claim was based on "retaliation against him for making discrimination claims and for adverse actions other than the [Notice of Rejection During Probation] [¶] Accordingly the Stipulation does not bar the claims advanced here."

## DISCUSSION

We review issues of law de novo. (*Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1191.) A trial court's evidentiary rulings, including those involving the hearsay nature of evidence, are reviewed for abuse of discretion. (*Bennett v. Superior Court* (2019) 39 Cal.App.5th 862, 876.) An evidentiary ruling that "rests on an error of law is an abuse of discretion." (*Ibid.*)

Error alone is not sufficient to reverse a judgment. We reverse only when a party demonstrates that prejudicial error occurred and caused appellant "substantial injury" and that a

14

"different result would have been probable" absent the error. (Code Civ. Proc., § 475.) Reversal, thus, is warranted where " 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800.) Such a " 'probability' in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*." (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715.) In assessing the prejudicial effect of errors, we may find multiple errors cumulatively prejudicial, even if each error would be not prejudicial when viewed individually. (*Lewis v. City of Benicia* (2014) 224 Cal.App.4th 1519, 1539.)

A.    *Admission of Evidence of Acts Predating the March/April EEO Complaint as Evidence of Retaliation Was Error*

Appellant contends the trial court erred in permitting Kourounian to introduce evidence of actions by Saghbazarian which occurred before Kourounian's protected activity of filing the March/April EEO complaint. The parties agree the trial court found the evidence admissible to show the "totality of the circumstances." We agree the trial court abused its discretion.

1.    Motion in limine proceedings

In pre-trial motion in limine No. 2, the Department sought to exclude evidence of all conduct in Kourounian's EEO complaint that did not constitute retaliation. Specifically, the Department argued Kourounian's investigation of a taxpayer complaint was not a protected activity under FEHA, and FEHA only protects against retaliation caused by engaging in a protected activity. Kourounian's first protected activity was the March/April EEO complaint which alleged age and race discrimination (in addition

15

to the investigation of the taxpayer complaint). Adverse actions taken before a protected activity cannot constitute retaliation under FEHA. This was consistent with the trial court's ruling on demurrer.[2]

In his written opposition to the motion in limine, Kourounian conceded that based "on the rulings made by Judge Cotton on Defendant's demurrer to the SAC, Plaintiff agrees that, at trial, Plaintiff cannot seek compensation for any of the acts complained of in Plaintiff's March-April 2013 EEO complaints." Kourounian then argued that the fact that he filed the March/April EEO complaint and the content of the allegations in the documents submitted to the EEO were admissible on the issue of motive to demonstrate why Saghbazarian, Chiang, and/or Klomp would have a motive to retaliate against him, as alleged in his May 2013 claims.

At oral argument on the motion in limine, the Department argued "as to the first EEO complaint [in March/April 2013], I believe it's been acknowledged by . . . the plaintiff that it was based on an unprotected—an activity that was not protected under FEHA and, therefore, it does not constitute a complaint in retaliation. So nothing in that first EEO complaint should be able to be put into evidence as retaliation."

In response, the trial court stated its belief that it was for the jury to decide whether alleged acts were retaliation or not. Appellant protested that "the first EEO complaint is not, as a matter of law, a complaint of retaliation. So anything listed in that complaint cannot go to the jury." The court responded: "I

---

[2] The Department made this same argument in motion in limine No. 13, which was directed more broadly at precluding all evidence of any actions taken by Saghbazarian.

16

disagree. The prior judges in this case would disagree." As shown above, the trial court was mistaken as to Judge Cotton's previous ruling on the demurrer.

After the trial court denied the motion to preclude admission of the substance of the March/April EEO complaint, Kourounian's counsel stated: "I concur with the court, and we have to look at the totality of the circumstances on the retaliation issue. And I think plaintiff in all reasonableness, should be given the opportunity to present the totality of the circumstances, and I concur with the court's ruling on this." The court responded: "I agree. And the citation to [*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028 (*Yanowitz*)] is quite instructive, and I read it, and I read CACI number 2509, and that gets me to the result."

### 2. Analysis

As a matter of both logic and law, acts of retaliation must occur after the protected activity. " ' "To establish a prima facie case of retaliation, a plaintiff must show that she engaged in protected activity, that she was *thereafter* subjected to adverse employment action by her employer, and there was a causal link between the two." ' " (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 69, italics added.) "Because retaliation under FEHA requires the plaintiff to show that the employer was motivated to retaliate by the plaintiff's protected activity, actions the employer took before the plaintiff engaged in the protected activity necessarily are irrelevant." (*Nejadian v. County of Los Angeles* (2019) 40 Cal.App.5th 703, 724, fn. 17.)

The opinion in *Yanowitz* does not provide otherwise. The court simply permitted the consideration of all the employer's retaliatory acts as a whole. As the court explained, "there is no requirement that an employer's retaliatory acts constitute one

17

swift blow, rather than a series of subtle, yet damaging, injuries." (*Yanowitz, supra,* 36 Cal.4th at p. 1055.)  This does not change the requirement that retaliatory acts occur after the protected activity or, put differently, be prompted by the protected activity.

On appeal, Kourounian defends the trial court's ruling on the ground that his investigation of the taxpayer complaint "does show that Saghbazarian had a history of not liking to work with older individuals."  Kourounian also claims that other actions by Saghbazarian before the March/April EEO complaint "simply [go] to the weight of the evidence and the totality of the circumstances show Saghbazarian had a motive to retaliate against Kourounian based on age and race discrimination."

In settling his failed promotion appeal, Kourounian expressly waived his claims of age and race discrimination. Saghbazarian's history of not liking to work with older people has no relevance to a claim of retaliation.  Actionable retaliation must be based on an individual's engagement in protected activity, not his protected personal status.  Kourounian also contends the "trial court agreed to give a limiting instruction as to what time period was covered by Kourounian's claim for retaliation." This contention is not supported by the record.

Kourounian's claim that it was "important for the jury to put the entire story together and fully understand the circumstances surrounding Kourounian's claim of age and race discrimination" overstates the relevance of that claim.  There is no doubt that the fact that Kourounian filed an EEO complaint for age and race discrimination is highly relevant.  It is the protected activity needed for his claim; more colloquially it provides a motive for the retaliation.  The details of the discrimination are not relevant.  This was not a trial about

18

whether Saghbazarian engaged in race or age discrimination; Kourounian waived those claims in the prior settlement agreement.

### 3. Prejudice

We consider the prejudice from this ruling in section B, *post*.

### B. *Admission of the EEO Complaint Was Error*

Appellant contends the trial court erred when it found the original March EEO complaint (Exhibit 7), the April supplement (Exhibit 8) and the May EEO complaint (Exhibit 9) were not hearsay and then admitted those documents into evidence. We agree the trial court abused its discretion.

### 1. Trial court proceedings

Although there were 15 motions in limine, none directly concerned the admission of copies of the two EEO complaints. Kourounian's counsel simply moved to admit the documents during the examination of Kourounian. When the trial court asked if the Department objected, counsel replied: "We filed a written objection on six grounds, and we object primarily on hearsay, but on the other grounds as well." The court replied: "I don't know what you are referring to, the written objections."[3] The court directed the Department to make its objections on the record in open court. Counsel stated: "Object as hearsay." When the court asked if there were any other objections, counsel stated: "It's irrelevant. There's been a waiver. It's a 352 argument. It's

---

[3] We don't know either, as appellant has not provided a record cite for any written objections.

19

a statute of limitations issue and it's a failure to state a claim." The court overruled all these objections, indicating that the hearsay objection was overruled "as to the plaintiff's handwritten statements." The court then specifically ruled that as to Exhibit 7, the March/April EEO complaint, pages 7-1, 7-2, 7-5, 7-7, 7-8, 7-9, 7-10, 7-11, 7-12, and 7-13 were admitted. This is essentially the entirety of the complaint itself. The hearsay objection was sustained as to the rest of the document.

Later, outside the presence of the jury, the Department asked to speak to the admissibility of the document. The court replied: "I really don't want to entertain argument. I've ruled on it." The court stated: "These are the statements of the plaintiff. All these pages have only the statements of the plaintiff." Appellant stated: "Which is hearsay." The court replied: "He's testifying. He's being cross-examined. These are his statements. This is not hearsay, and it has independent legal relevance because it is the gravamen of his complaint what he said to the reporting agencies. You can cross-examine him and them tell the jury if your cross-examination is effective that his statements should not be given weight, but they are his statements. [¶] The statements of other people are clearly excluded. You're correct. Emails that have both the plaintiff's statements and other people's statements have been categorically excluded because they are mixed and it's not crossed off enough." The trial court was mistaken.

Appellant also verbally objected to the admission of Exhibits 8 and 9 on the ground that they were hearsay. The trial court overruled the objections without elaboration.

20

2.    <u>Analysis</u>

"Hearsay may be briefly understood as an out-of-court statement offered for the truth of its content.  Evidence Code section 1200, subdivision (a) formally defines hearsay as 'evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated.'  A 'statement' is 'oral or written verbal expression' or the 'nonverbal conduct of a person intended by him as a substitute for oral or written verbal expression.' (Evid. Code, § 225.)" (*People v. Sanchez* (2016) 63 Cal.4th 665, 674.)  "Documents like letters, reports, and memoranda are often hearsay because they are prepared by a person outside the courtroom and are usually offered to prove the truth of the information they contain.  Documents may also contain multiple levels of hearsay.  An emergency room report, for example, may record the observations made by the writer, along with statements made by the patient.  If offered for its truth, the report itself is a hearsay statement made by the person who wrote it.  Statements of others, related by the report writer, are a second level of hearsay.  Multiple hearsay may not be admitted unless there is an exception for each level." (*Sanchez,* at pp. 674–675.)

There is no doubt that the EEO complaints were prepared outside the courtroom.  Thus, like an emergency room report, Kourounian's written complaints, if offered for its truth, is a hearsay statement made by Kourounian, the person who wrote it.

The fact that Kourounian was available for cross-examination does not transform his statements in the complaints into non-hearsay or provide an exception to the hearsay rule. " 'Hearsay is generally excluded because the out-of-court

21

declarant is not under oath and cannot be cross-examined to test perception, memory, clarity of expression, and veracity, and because the jury (or other trier of fact) is unable to observe the declarant's demeanor.' [Citation.]  To challenge a testifying witness's own prior, out-of-court statement as inadmissible hearsay is unusual, but we agree with defendant that [the testifying witness's] own statement to his wife constituted hearsay evidence, for it was an out-of-court statement that was offered for its truth." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1307–1308, fn. omitted.)  We are not free to disregard this holding by the Supreme Court and, contrary to Kourounian's claim, neither was the trial court.

The fact that Kourounian is a party, not merely a witness, does not make his out-of-court statements admissible.  The Evidence Code provides only limited exceptions to the hearsay rule for the out-of-court statements of a party, and Kourounian has not identified any of them as applicable.

Finally, by way of analogy, federal caselaw is abundant that EEOC charges are inadmissible hearsay as is the narrative attached to the charge.  (*Delaney v. Bank of America Corp.* (2d Cir. 2014) 766 F.3d 163, 169; *Abbott v. Elwood Staffing Services, Inc.* (N.D.Ala. 2014) 44 F.Supp.3d 1125, 1139; *Stolarczyk ex rel. Est. of Stolarczyk v. Senator Intern. Freight Forwarding* (N.D.Ill. 2005) 376 F.Supp.2d 834, 841–842.)

We do not understand what the trial court meant by the complaints having "independent legal relevance because it is the gravamen of his complaint what he said to the reporting agencies" or why it believed that reasoning would take the statements outside the hearsay rule.  Gravamen is generally understood to mean "the substantial point or essence of a claim,

grievance or complaint." (Black's Law Dict. (10th ed. 2014) p. 817, col. 1; Garner, Dict. of Modern Legal Usage (2d ed. 1995) p. 391 ["the point of a complaint or grievance"].)

In its ruling denying appellant's motion for a new trial, the court suggested that it had admitted the EEO complaints for a limited purpose. The court stated that "the EEO complaints and emails were relevant to Plaintiff's contention that he gave notice to [the Department] of its retaliatory conduct. In addition, as Plaintiff argued, these documents reflected his state of mind, an exception to the hearsay rule." Nothing in the trial record indicates the complaints were admitted for any limited purpose.

On appeal, Kourounian contends he did not offer the complaints for the truth of the matter "but for other legitimate reasons" such as notice to appellant, Kourounian's state of mind and his good faith and reasonable belief that he was being discriminated against. We strongly question whether those purposes would have justified admitting the entirety of the complaints, particularly since notice to the EEO and Kourounian's good faith belief do not appear to have been in dispute.[4] But whatever Kourounian's purpose was for seeking admission of the complaints, he did not articulate it when he moved to admit the complaints into evidence, and he remained silent when the trial court ruled they were not hearsay. Given Kourounian's silence and the trial court's belief that the statements were not hearsay, the Department had no basis to

_____

[4] We do not see the relevance of Kourounian's state of mind to any issue in this action, but if, by state of mind, Kourounian means his emotional response to the discrimination and retaliation, we agree with the Department that there is very little on this subject in the complaints.

23

request a limiting instruction that the statements were not being admitted for their truth and/or under some other exception to the hearsay rule such as state of mind. As a result, the complaints were admitted without any restrictions. This was error.

While the Department had no basis to request a limiting instruction, the trial court gave the Department the opportunity to make other objections. We find the Department did not use this opportunity to make other objections it is now asserting on appeal, specifically that statements in the complaints violated two of the trial court's in limine rulings prohibiting legal conclusions and evidence of Kourounian's rejection on probation. Accordingly, we find those contentions waived.[5]

Finally, we turn to the Department's claims that the complaints contained "inflammatory and damaging characterizations of the alleged retaliators that were nothing more than Kourounian's subjective opinion." In many instances, the Department refers to a single word without context and without a specific page cite. In its reply brief, appellant contends: "A simple reading of the 12-pages of EEO narratives evidences the prejudice to the Department." It does not. The Department has forfeited all contentions based on reference to a single quoted word with no specific record cite or supporting legal argument.

---

[5] The Department is excused from making an objection that the complaints involved multiple hearsay, that is statements by Kourounian recounting out-of-court statements by others. The trial court's remarks show that such an objection would have been futile.

3. Prejudice

In analyzing prejudice, we consider the March/April EEO complaint separately from the May EEO complaint. The substance of the March/April complaint was not relevant to any issue in this case. The substance of the May EEO complaint was relevant to show retaliation for engagement in a protected activity, although not as hearsay.

We do not find prejudice to appellant from the admission of the May EEO complaint. It was brief and Kourounian and Balagula testified at trial about the specific incidents in the complaint. As set forth in the BACKGROUND section, *ante*, there was ample other evidence of Chiang's adverse actions toward Kourounian and these are far more serious than the incidents in the complaint.

In contrast, the jury received a double dose of evidence about irrelevant actions by Saghbazarian that predated the March/April EEO complaint. This double dose was in the form of some live testimony and the written complaint. Saghbazarian's conduct before the filing of the complaint is very similar to Chiang's conduct after the protected filing of the March/April EEO complaint, even though it was only Saghbazarian who was named as the offending party in the March/April EEO complaint for age and race discrimination. Moreover, the switch in supervisors from Saghbazarian to Chiang occurred after Kourounian filed his March/April EEO complaint. The jury was aware that the two women were friends, and there was evidence that Chiang was unhappy with Kourounian's taxpayer investigation findings, presumably on behalf of her friend. The similarity of conduct of the two supervisors suggests a concert of action and bolsters the theory that Chiang indeed was acting

with a retaliatory motive.  Put differently, it strengthens the credibility of Kourounian's claim of retaliatory animus.  When evidence of Klomp's similar conduct is added into the mix, it paints a picture of three very high-ranking employees of the Department engaged in concerted action to punish an employee under them for alleging FEHA violations.  This is a much more damaging scenario to the Department, which is the only defendant in this action, than it would be if the evidence suggested Chiang was acting on her own.

Further, in addition to the invalid retaliation claim evidence, the March/April complaint, primarily the supplement, alleged age and race discrimination by Saghbazarian.  These acts have a tendency to show Saghbazarian as someone who was prejudiced and willing to act in violation of the law.  The claims were settled, however, and their truth was never adjudicated; the jury should never have learned of any claim details.  At a minimum, the acts have a tendency to undermine her credibility about her behavior post-March/April complaint.  More importantly, the evidence at trial made clear that Saghbazarian is not only still in appellant's employ, but also has been promoted.  Given the improperly admitted evidence of Saghbazarian's allegedly discriminatory behavior, the Department looks complicit in ratifying potentially prohibited or illegal behavior.

This was a 9-3 verdict, a close case, where there was affirmative evidence presented by both parties for the jury to consider.  We conclude there is a reasonable probability that if the evidence at trial had commenced with the filing of Kourounian's March/April EEO complaint, instead of reaching back into irrelevant time periods, the Department would have

26

received a more favorable verdict. (*Kotla v. Regents of University of California* (2004) 115 Cal.App.4th 283, 289, 294 [prejudice found where the vote was 9-3 and there was evidence presented by both parties from which either retaliation could be inferred or plausible nonretaliatory reasons could be sustained].) The total number of alleged bad acts by the Department would have been reduced, a conspiracy among Saghbazarian, Chiang and Klomp to retaliate against Kourounian would have appeared less likely, and Saghbazarian's acts of ignoring Kourounian and Chiang's and Klomp's fits of anger and hostility would have seemed less menacing.

## DISPOSITION

The judgment is reversed. Respondent to pay costs on appeal.

**CERTIFIED FOR PUBLICATION**

STRATTON, P. J.

We concur:

GRIMES, J.

WILEY, J.